# RHODES, GOVERNOR OF OHIO, ET AL. *v.* CHAPMAN ET AL.

No. 80–332.   Argued March 2, 1981—Decided June 15, 1981

POWELL, J., delivered the opinion for the Court, in which BURGER, C. J., and STEWART, WHITE, and REHNQUIST, JJ., joined. BRENNAN, J., filed an opinion concurring in the judgment, in which BLACKMUN and STEVENS, JJ., joined, *post*, p. 352. BLACKMUN, J., filed an opinion concurring in the judgment, *post*, p. 368. MARSHALL, J., filed a dissenting opinion, *post*, p. 369.

*Allen P. Adler*, Assistant Attorney General of Ohio, argued the cause for petitioners. With him on the briefs were *William J. Brown*, Attorney General, and *Leo J. Conway*, Assistant Attorney General.

*Jean P. Kamp* argued the cause for respondents. With her on the brief were *Louis A. Jacobs* and *Bruce A. Campbell.**

---

*Briefs of *amici curiae* urging reversal were filed for the State of Alaska et al. by *Wilson L. Condon*, Attorney General of Alaska, *Bob Corbin*, Attorney General of Arizona, *J. D. McFarlane*, Attorney General of Colorado, *Carl R. Ajello*, Attorney General of Connecticut, *Richard S. Gebelien*, Attorney General of Delaware, *Jim Smith*, Attorney General of Florida, *Wayne Minami*, Attorney General of Hawaii, *David H. LeRoy*, Attorney General of Idaho, *Tyrone C. Fahner*, Attorney General of Illinois, *Theodore L. Sendak*, Attorney General of Indiana, *Robert T. Stephan*, Attorney General of Kansas, *Steven L. Beshear*, Attorney General of Kentucky, *William J. Guste, Jr.*, Attorney General of Louisiana, and *Kendall L. Vick*, Assistant Attorney General, *Warren R. Spannaus*, Attorney General of Minnesota, *Bill Alain*, Attorney General of Mississippi, *John Ashcroft*,

Justice Powell delivered the opinion of the Court.

The question presented is whether the housing of two inmates in a single cell at the Southern Ohio Correctional Facility is cruel and unusual punishment prohibited by the Eighth and Fourteenth Amendments.

## I

Respondents Kelly Chapman and Richard Jaworski are inmates at the Southern Ohio Correctional Facility (SOCF), a maximum-security state prison in Lucasville, Ohio. They were housed in the same cell when they brought this action in the District Court for the Southern District of Ohio on

Attorney General of Missouri, *Mike Greely,* Attorney General of Montana, *Paul L. Douglas,* Attorney General of Nebraska, *Richard H. Bryan,* Attorney General of Nevada, *Gregory H. Smith,* Acting Attorney General of New Hampshire, *Rufus L. Edmisten,* Attorney General of North Carolina, *Allen I. Olson,* Attorney General of North Dakota, *Jan Eric Cartwright,* Attorney General of Oklahoma, *James M. Brown,* Attorney General of Oregon, *John R. McCulloch, Jr.,* Solicitor General, *William F. Gary,* Deputy Solicitor General, and *James E. Mountain, Jr.,* and *Jan Peter Londahl,* Assistant Attorneys General, *Dennis J. Roberts II,* Attorney General of Rhode Island, *Daniel R. McLeod,* Attorney General of South Carolina, *Mark V. Meierhenry,* Attorney General of South Dakota, *William M. Leech, Jr.,* Attorney General of Tennessee, *Robert B. Hansen,* Attorney General of Utah, *M. Jerome Diamone,* Attorney General of Vermont, *Marshall Coleman,* Attorney General of Virginia, *Ive Arlington Swan,* Attorney General of the Virgin Islands, *Slade Gorton,* Attorney General of Washington, *Chauncey H. Browning, Jr.,* Attorney General of West Virginia, *Bronson C. La Follette,* Attorney General of Wisconsin, and *John D. Troughton,* Attorney General of Wyoming; and for the State of Texas by *Mark White,* Attorney General, *John W. Fainter, Jr.,* First Assistant Attorney General, *Richard E. Gray III,* Executive Assistant Attorney General, and *W. Barton Boling, Ed Idar, Jr.,* and *Kenneth L. Petersen, Jr.,* Assistant Attorneys General.

Briefs of *amici curiae* urging affirmance were filed by *John A. Krichbaum* for the American Medical Association et al.; and by *Quin Denvir* and *Laurance S. Smith* for the State Public Defender of California.

*Solicitor General McCree* filed a brief for the United States as *amicus curiae.*

behalf of themselves and all inmates similarly situated at
SOCF. Asserting a cause of action under 42 U. S. C. § 1983,
they contended that "double celling" at SOCF violated the
Constitution. The gravamen of their complaint was that
double celling confined cellmates too closely. It also was
blamed for overcrowding at SOCF, said to have overwhelmed
the prison's facilities and staff.[1] As relief, respondents
sought an injunction barring petitioners, who are Ohio offi-
cials responsible for the administration of SOCF, from hous-
ing more than one inmate in a cell, except as a temporary
measure.

The District Court made extensive findings of fact about
SOCF on the basis of evidence presented at trial and the
court's own observations during an inspection that it con-
ducted without advance notice. 434 F. Supp. 1007 (1977).
These findings describe the physical plant, inmate popula-
tion, and effects of double celling. Neither party contends
that these findings are erroneous.

SOCF was built in the early 1970's. In addition to 1,620
cells, it has gymnasiums, workshops, schoolrooms, "dayrooms,"
two chapels, a hospital ward, commissary, barbershop, and
library.[2] Outdoors, SOCF has a recreation field, visitation

---

[1] As a result of the judgment in respondents' favor, double celling has
been substantially eliminated at SOCF. But the increases in Ohio's state-
wide prison population, which prompted double celling at SOCF, have
continued. Furthermore, because SOCF is Ohio's only maximum-security
prison, the transfer of some of SOCF's inmates into lesser security prisons
has created special problems for the recipient prisons. Tr. of Oral Arg.
5–6. Thus, petitioners have an interest in resuming double celling at
SOCF. See *Bell* v. *Wolfish*, 441 U. S. 520, 542–543, n. 25 (1979).

[2] SOCF's library contains 25,000 volumes, including lawbooks, and was
described by the District Court as "modern, well-lit," and "superior in
quality and quantity." 434 F. Supp., at 1010. The court described
SOCF's classrooms as "light, airy, and well equipped." *Id.*, at 1015. The
court did not describe SOCF's workshops except to identify them as a
laundry, machine shop, shoe factory, sheet metal shop, printshop, sign
shop, and engine-repair shop. See *id.*, at 1010.

area, and garden. The District Court described this physical plant as "unquestionably a top-flight, first-class facility." *Id.*, at 1009.

Each cell at SOCF measures approximately 63 square feet. Each contains a bed measuring 36 by 80 inches, a cabinet-type night stand, a wall-mounted sink with hot and cold running water, and a toilet that the inmate can flush from inside the cell. Cells housing two inmates have a two-tiered bunk bed. Every cell has a heating and air circulation vent near the ceiling, and 960 of the cells have a window that inmates can open and close. All of the cells have a cabinet, shelf, and radio built into one of the walls, and in all of the cells one wall consists of bars through which the inmates can be seen.

The "dayrooms" are located adjacent to the cellblocks and are open to inmates between 6:30 a. m. and 9:30 p. m. According to the District Court, "[t]he day rooms are in a sense part of the cells and they are designed to furnish that type of recreation or occupation which an ordinary citizen would seek in his living room or den." *Id.*, at 1012. Each dayroom contains a wall-mounted television, card tables, and chairs. Inmates can pass between their cells and the dayrooms during a 10-minute period each hour, on the hour, when the doors to the dayrooms and cells are opened.

As to the inmate population, the District Court found that SOCF began receiving inmates in late 1972 and double cell-ing them in 1975 because of an increase in Ohio's statewide prison population. At the time of trial, SOCF housed 2,300 inmates, 67% of whom were serving life or other long-term sentences for first-degree felonies. Approximately 1,400 in-mates were double celled. Of these, about 75% had the choice of spending much of their waking hours outside their cells, in the dayrooms, school, workshops, library, visits, meals, or showers. The other double-celled inmates spent

more time locked in their cells because of a restrictive classification.[3]

The remaining findings by the District Court addressed respondents' allegation that overcrowding created by double celling overwhelmed SOCF's facilities and staff. The food was "adequate in every respect," and respondents adduced no evidence "whatsoever that prisoners have been underfed or that the food facilities have been taxed by the prison population." *Id.*, at 1014. The air ventilation system was adequate, the cells were substantially free of offensive odor, the temperature in the cellblocks was well controlled, and the noise in the cellblocks was not excessive. Double celling had not reduced significantly the availability of space in the dayrooms or visitation facilities,[4] nor had it rendered inadequate the resources of the library or schoolrooms.[5] Although there were isolated incidents of failure to provide medical or dental care, there was no evidence of indifference by the SOCF staff to inmates' medical or dental needs.[6] As to violence, the court found that the number of acts of violence at

---

[3] Inmates who requested protective custody but could not substantiate their fears were classified as "limited activity" and were locked in their cells all but six hours a week. Inmates classified as "voluntarily idle" and newly arrived inmates awaiting classification had only four hours a week outside their cells. Inmates housed in administrative isolation for disciplinary reasons were allowed out of their cells for two hours a week to attend religious services, a movie, or the commissary.

[4] The court noted that SOCF is one of the few maximum-security prisons in the country to permit contact visitation for all inmates. *Id.*, at 1014.

[5] The court found that adequate lawbooks were available, even to inmates in protective or disciplinary confinement, to allow effective access to court. As to school, no inmate who was "ready, able, and willing to receive schooling has been denied the opportunity," although there was some delay before an inmate received the opportunity to attend. *Id.*, at 1015.

[6] Turnover in the dental staff had caused a temporary but substantial backlog of inmates needing routine dental care, but the dental staff treated emergencies. *Id.*, at 1016.

SOCF had increased with the prison population, but only in proportion to the increase in population. Respondents failed to produce evidence establishing that double celling itself caused greater violence, and the ratio of guards to inmates at SOCF satisfied the standard of acceptability offered by respondents' expert witness. Finally, the court did find that the SOCF administration, faced with more inmates than jobs, had "water[ed] down" jobs by assigning more inmates to each job than necessary and by reducing the number of hours that each inmate worked, *id.*, at 1015; it also found that SOCF had not increased its staff of psychiatrists and social workers since double celling had begun.

Despite these generally favorable findings, the District Court concluded that double celling at SOCF was cruel and unusual punishment. The court rested its conclusion on five considerations. One, inmates at SOCF are serving long terms of imprisonment. In the court's view, that fact "can only accent[uate] the problems of close confinement and overcrowding." *Id.*, at 1020. Two, SOCF housed 38% more inmates at the time of trial than its "design capacity." In reference to this the court asserted: "Overcrowding necessarily involves excess limitation of general movement as well as physical and mental injury from long exposure." *Ibid.* Three, the court accepted as contemporary standards of decency several studies recommending that each person in an institution have at least 50–55 square feet of living quarters.[7] In contrast, double-celled inmates at SOCF share 63 square feet. Four, the court asserted that "[a]t the best a prisoner who is double celled will spend most of his time in the cell

---

[7] The District Court cited, *e. g.*, American Correctional Assn., Manual of Standards for Adult Correctional Institutions, Standard No. 4142, p. 27 (1977) (60–80 square feet); National Sheriffs' Assn., A Handbook on Jail Architecture 63 (1975) (70–80 square feet); National Council on Crime and Delinquency, Model Act for the Protection of Rights of Prisoners, § 1, 18 Crime & Delinquency 4, 10 (1972) (50 square feet).

with his cellmate."[8]  *Id.,* at 1021.  Five, SOCF has made double celling a practice; it is not a temporary condition.[9]

On appeal to the Court of Appeals for the Sixth Circuit, petitioners argued that the District Court's conclusion must be read, in light of its findings, as holding that double celling is *per se* unconstitutional.  The Court of Appeals disagreed; it viewed the District Court's opinion as holding only that double celling is cruel and unusual punishment under the circumstances at SOCF.  It affirmed, without further opinion, on the ground that the District Court's findings were not clearly erroneous, its conclusions of law were "permissible from the findings," and its remedy was a reasonable response to the violations found.[10]

We granted the petition for certiorari because of the importance of the question to prison administration.  449 U. S. 951 (1980).  We now reverse.

## II

We consider here for the first time the limitation that the Eighth Amendment, which is applicable to the States through

---

[8] The basis of the District Court's assertion as to the amount of time that inmates spend in their cells does not appear in the court's opinion. Elsewhere in its opinion, the court found that 75% of the double-celled inmates at SOCF are free to be out of their cells from 6:30 a. m. to 9 p. m.  434 F. Supp., at 1012, 1013.  The court stated that it made this finding on the basis of prison regulations on inmate classification, which petitioners submitted as exhibits.  *Id.,* at 1012.

[9] Rather than order that petitioners either move respondents into single cells or release them, as respondents urged, the District Court initially ordered petitioners to "proceed with reasonable dispatch to formulate, propose, and carry out some plan which will terminate double celling at SOCF."  *Id.,* at 1022.  Petitioners submitted five plans, each of which the court rejected.  It then ordered petitioners to reduce the inmate population at SOCF by 25 men per month until the population fell to the prison's approximate design capacity of 1,700.  App. to Pet. for Cert. A–39.

[10] The Court of Appeals stated its conclusion in a two-paragraph order of affirmance that it filed but did not publish.  See 624 F. 2d 1099 (1980).

the Fourteenth Amendment, *Robinson* v. *California,* 370 U. S. 660 (1962), imposes upon the conditions in which a State may confine those convicted of crimes. It is unquestioned that "[c]onfinement in a prison . . . is a form of punishment subject to scrutiny under the Eighth Amendment standards." *Hutto* v. *Finney,* 437 U. S. 678, 685 (1978); see *Ingraham* v. *Wright,* 430 U. S. 651, 669 (1977); cf. *Bell* v. *Wolfish,* 441 U. S. 520 (1979). But until this case, we have not considered a disputed contention that the conditions of confinement at a particular prison constituted cruel and unusual punishment.[11] Nor have we had an occasion to consider specifically the principles relevant to assessing claims that conditions of confinement violate the Eighth Amendment. We look, first, to the Eighth Amendment precedents for the general principles that are relevant to a State's authority to impose punishment for criminal conduct.

## A

The Eighth Amendment, in only three words, imposes the constitutional limitation upon punishments: they cannot be "cruel and unusual." The Court has interpreted these words "in a flexible and dynamic manner," *Gregg* v. *Georgia,* 428 U. S. 153, 171 (1976) (joint opinion), and has extended the Amendment's reach beyond the barbarous physical punishments at issue in the Court's earliest cases. See *Wilkerson*

---

[11] In *Hutto* v. *Finney,* 437 U. S. 678 (1978), the state prison administrators did not dispute the District Court's conclusion that the conditions in two Arkansas prisons constituted cruel and unusual punishment. *Id.,* at 685. In *Ingraham* v. *Wright,* 430 U. S. 651 (1977), the question was whether corporal punishment in a public school constituted cruel and unusual punishment. We held that the Eighth and Fourteenth Amendments do not apply to public school disciplinary practices. In considering the differences between a prisoner and a schoolchild, we stated: "Prison brutality . . . is 'part of the total punishment to which the individual is being subjected for his crime and, as such, is a proper subject for Eighth Amendment scrutiny.'" *Id.,* at 669, quoting *Ingraham* v. *Wright,* 525 F. 2d 909, 915 (CA5 1976).

v. *Utah,* 99 U. S. 130 (1879); *In re Kemmler,* 136 U. S. 436 (1890). Today the Eighth Amendment prohibits punishments which, although not physically barbarous, "involve the unnecessary and wanton infliction of pain," *Gregg* v. *Georgia, supra,* at 173, or are grossly disproportionate to the severity of the crime, *Coker* v. *Georgia,* 433 U. S. 584, 592 (1977) (plurality opinion); *Weems* v. *United States,* 217 U. S. 349 (1910).[12] Among "unnecessary and wanton" inflictions of pain are those that are "totally without penological justification." *Gregg* v. *Georgia, supra,* at 183; *Estelle* v. *Gamble,* 429 U. S. 97, 103 (1976).

No static "test" can exist by which courts determine whether conditions of confinement are cruel and unusual, for the Eighth Amendment "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Trop* v. *Dulles,* 356 U. S. 86, 101 (1958) (plurality opinion). The Court has held, however, that "Eighth Amendment judgments should neither be nor appear to be merely the subjective views" of judges. *Rummel* v. *Estelle,* 445 U. S. 263, 275 (1980). To be sure, "the Constitution contemplates that in the end [a court's] own judgment will be brought to bear on the question of the acceptability" of a given punishment. *Coker* v. *Georgia, supra,* at 597 (plurality opinion); *Gregg* v. *Georgia, supra,* at 182 (joint opinion). But such "'judgment[s] should be informed by objective factors to the maximum possible extent.'" *Rummel* v. *Estelle, supra,* at 274–275, quoting *Coker* v. *Georgia, supra,* at 592 (plurality opinion). For example, when the question was whether capital punishment for certain crimes violated contemporary values, the Court looked for "objective indicia" derived from history, the action of

---

[12] The Eighth Amendment also imposes a substantive limit on what can be made criminal and punished as such. *Robinson* v. *California,* 370 U. S. 660 (1962). This aspect of the Eighth Amendment is not involved in this case.

state legislatures, and the sentencing by juries. *Gregg* v. *Georgia, supra,* at 176–187; *Coker* v. *Georgia, supra,* at 593–596. Our conclusion in *Estelle* v. *Gamble, supra,* that deliberate indifference to an inmate's medical needs is cruel and unusual punishment rested on the fact, recognized by the common law and state legislatures, that "[a]n inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met." 429 U. S., at 103.

These principles apply when the conditions of confinement compose the punishment at issue. Conditions must not involve the wanton and unnecessary infliction of pain, nor may they be grossly disproportionate to the severity of the crime warranting imprisonment. In *Estelle* v. *Gamble, supra,* we held that the denial of medical care is cruel and unusual because, in the worst case, it can result in physical torture, and, even in less serious cases, it can result in pain without any penological purpose. 429 U. S., at 103. In *Hutto* v. *Finney, supra,* the conditions of confinement in two Arkansas prisons constituted cruel and unusual punishment because they resulted in unquestioned and serious deprivations of basic human needs. Conditions other than those in *Gamble* and *Hutto,* alone or in combination, may deprive inmates of the minimal civilized measure of life's necessities. Such conditions could be cruel and unusual under the contemporary standard of decency that we recognized in *Gamble, supra,* at 103–104. But conditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional. To the extent that such conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society.

## B

In view of the District Court's findings of fact, its conclusion that double celling at SOCF constitutes cruel and unusual punishment is insupportable. Virtually every one

of the court's findings tends to *refute* respondents' claim. The double celling made necessary by the unanticipated increase in prison population did not lead to deprivations of essential food, medical care, or sanitation. Nor did it increase violence among inmates or create other conditions intolerable for prison confinement. 434 F. Supp., at 1018. Although job and educational opportunities diminished marginally as a result of double celling, limited work hours and delay before receiving education do not inflict pain, much less unnecessary and wanton pain; deprivations of this kind simply are not punishments. We would have to wrench the Eighth Amendment from its language and history to hold that delay of these desirable aids to rehabilitation violates the Constitution.

The five considerations on which the District Court relied also are insufficient to support its constitutional conclusion. The court relied on the long terms of imprisonment served by inmates at SOCF; the fact that SOCF housed 38% more inmates than its "design capacity"; the recommendation of several studies that each inmate have at least 50–55 square feet of living quarters; the suggestion that double-celled inmates spend most of their time in their cells with their cellmates; and the fact that double celling at SOCF was not a temporary condition. *Supra*, at 343–344. These general considerations fall far short in themselves of proving cruel and unusual punishment, for there is no evidence that double celling under these circumstances either inflicts unnecessary or wanton pain or is grossly disproportionate to the severity of crimes warranting imprisonment.[13] At most, these con-

---

[13] Respondents and the District Court erred in assuming that opinions of experts as to desirable prison conditions suffice to establish contemporary standards of decency. As we noted in *Bell* v. *Wolfish*, 441 U. S., at 543–544, n. 27, such opinions may be helpful and relevant with respect to some questions, but "they simply do not establish the constitutional minima; rather, they establish goals recommended by the organization in question." See U. S. Dept. of Justice, Federal Standards for Prisons and Jails 1 (1980). Indeed, generalized opinions of experts cannot weigh as

siderations amount to a theory that double celling inflicts pain.[14] Perhaps they reflect an aspiration toward an ideal environment for long-term confinement. But the Constitution does not mandate comfortable prisons, and prisons of SOCF's type, which house persons convicted of serious crimes, cannot be free of discomfort. Thus, these considerations properly are weighed by the legislature and prison administration rather than a court. There being no constitutional violation,[15] the District Court had no authority to con-

___

heavily in determining contemporary standards of decency as "the public attitude toward a given sanction." *Gregg* v. *Georgia,* 428 U. S. 153, 173 (1976) (joint opinion). We could agree that double celling is not desirable, especially in view of the size of these cells. But there is no evidence in this case that double celling is viewed generally as violating decency. Moreover, though small, the cells in SOCF are exceptionally modern and functional; they are heated and ventilated and have hot and cold running water and a sanitary toilet. Each cell also has a radio. 434 F. Supp., at 1011.

[14] Respondents contend that the close confinement of double celling for long periods creates a dangerous potential for frustration, tension, and violence. In respondents' view, it would be an infliction of unnecessary and wanton pain if double celling led to rioting. The danger of prison riots is a serious concern, shared by the public as well as by prison authorities and inmates. But respondents' contention does not lead to the conclusion that double celling at SOCF is cruel and unusual, whatever may be the situation in a different case. The District Court's findings of fact lend no support to respondents' claim in this case. Moreover, a prison's internal security is peculiarly a matter normally left to the discretion of prison administrators. See *Bell* v. *Wolfish, supra,* at 551, and n. 32; *Jones* v. *North Carolina Prisoners' Labor Union,* 433 U. S. 119, 132–133 (1977); *Pell* v. *Procunier,* 417 U. S. 817, 827 (1974).

[15] The dissenting opinion states that "the facility described by [the Court] is not the one involved in this case." *Post,* at 369–370. The incorrectness of this statement is apparent from an examination of the facts set forth at length above, see *supra,* at 340–343, and nn. 2–6, and the District Court's detailed findings of fact. See 434 F. Supp., at 1009–1018.

In several instances, the dissent selectively relies on testimony without acknowledging that the District Court gave it little or no weight. For example, the dissent emphasizes the testimony of experts as to psychological problems that "may be expected" from double celling; it also

sider whether double celling in light of these considerations was the best response to the increase in Ohio's statewide prison population.

---

relies on similar testimony as to an increase in tension and aggression. *Id.*, at 1017. The dissent fails to mention, however, that the District Court also referred to the testimony by the prison superintendent and physician that "there has been no increase [in violence] other than what one would expect from increased numbers [of inmates]." *Id.*, at 1018. More telling is the fact—ignored by the dissent—that the District Court resolved this conflict in the testimony by holding "that there had been no increase in violence or criminal activity increase due to double celling; there has been [an increase] due to increased population." *Ibid.* This holding was based on uncontroverted prison records, required to be maintained by the Ohio Department of Corrections and described by the District Court as being "detail[ed] and bespeak[ing] credibility." *Ibid.*

There is some ambiguity in the opinion of the District Court concerning the amount of time that double-celled inmates were required to remain in their cells. The dissent, *post*, at 373, n. 6, relies only on selective findings that most inmates are out of their cells only 10 hours each day, and that others are out only 4–6 hours a week. 434 F. Supp., at 1013. The dissent fails to note that the first of these findings is flatly inconsistent with a prior, twice-repeated, finding by the court that inmates "have to be locked in their cell with their cellmate only from around 9:00 p. m. to 6:30 a. m.," *id.*, at 1013, 1012, leaving them free to move about for some 14 hours. Moreover, it is unquestioned—and also not mentioned by the dissent—that the inmates who spend most of their time locked in their cells are those who have a "restrictive classification." These include inmates found guilty of "rule infractions [after] a plenary hearing" and inmates who "are there by 'choice' (at least to some degree)." *Ibid.* It must be remembered that SOCF is a maximum-security prison, housing only persons guilty of violent and other serious crimes. It is essential to maintain a regime of close supervision and discipline.

The dissent also makes much of the fact that SOCF was housing 38% more inmates at the time of trial than its "rated capacity." According to the United States Bureau of Prisons, at least three factors influence prison population: the number of arrests, prosecution policies, and sentencing and parole decisions. Because these factors can change rapidly, while prisons require years to plan and build, it is extremely difficult to calibrate a prison's "rated" or "design capacity" with predictions of prison population. Memorandum of United States as *Amicus Curiae* 3, 6. The question before us is not whether the designer of SOCF guessed incor-

## III

This Court must proceed cautiously in making an Eighth Amendment judgment because, unless we reverse it, "[a] decision that a given punishment is impermissible under the Eighth Amendment cannot be reversed short of a constitutional amendment," and thus "[r]evisions cannot be made in the light of further experience." *Gregg* v. *Georgia,* 428 U. S., at 176. In assessing claims that conditions of confinement are cruel and unusual, courts must bear in mind that their inquiries "spring from constitutional requirements and that judicial answers to them must reflect that fact rather than a court's idea of how best to operate a detention facility." *Bell* v. *Wolfish,* 441 U. S., at 539.[16]

---

rectly about future prison population, but whether the actual conditions of confinement at SOCF are cruel and unusual.

[16] We have sketched before the magnitude of the problems of prison administration. *Procunier* v. *Martinez,* 416 U. S. 396, 404–405 (1974). See generally National Institute of Justice, American Prisons and Jails (1980) (5 vols.). It suffices here to repeat:

"[T]he problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree. Most require expertise, comprehensive planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. For all of those reasons, courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform. Judicial recognition of that fact reflects no more than a healthy sense of realism." *Procunier* v. *Martinez, supra,* at 404–405 (footnote omitted).

See also *Wolff* v. *McDonnell,* 418 U. S. 539, 561–562, 568 (1974); *Jones* v. *North Carolina Prisoners' Labor Union, supra,* at 125.

Since our decision in *Martinez,* the problems of prison population and administration have been exacerbated by the increase of serious crime and the effect of inflation on the resources of States and communities. This case is illustrative. Ohio designed and built SOCF in the early 1970's, and even at the time of trial it was found to be a modern "top-flight, first-class facility." *Supra,* at 341. Yet, an unanticipated increase in the State's prison population compelled the double celling that is at issue.

Courts certainly have a responsibility to scrutinize claims of cruel and unusual confinement, and conditions in a number of prisons, especially older ones, have justly been described as "deplorable" and "sordid." *Bell* v. *Wolfish, supra,* at 562.[17] When conditions of confinement amount to cruel and unusual punishment, "federal courts will discharge their duty to protect constitutional rights." *Procunier* v. *Martinez,* 416 U. S. 396, 405–406 (1974); see *Cruz* v. *Beto,* 405 U. S. 319, 321 (1972) (*per curiam*). In discharging this oversight responsibility, however, courts cannot assume that state legislatures and prison officials are insensitive to the requirements of the Constitution or to the perplexing sociological problems of how best to achieve the goals of the penal function in the criminal justice system: to punish justly, to deter future crime, and to return imprisoned persons to society with an improved chance of being useful, law-abiding citizens.

In this case, the question before us is whether the conditions of confinement at SOCF are cruel and unusual. As we find that they are not, the judgment of the Court of Appeals is reversed.

*It is so ordered.*

JUSTICE BRENNAN, with whom JUSTICE BLACKMUN and JUSTICE STEVENS join, concurring in the judgment.

Today's decision reaffirms that "[c]ourts certainly have a responsibility to scrutinize claims of cruel and unusual confinement." *Ante,* this page. With that I agree. I also agree that the District Court's findings in this case do not support a judgment that the practice of double celling in the South-

---

[17] Examples of recent federal-court decisions holding prison conditions to be violative of the Eighth and Fourteenth Amendments include *Ramos* v. *Lamm,* 639 F. 2d 559 (CA10 1980), cert. denied, 450 U. S. 1041 (1981); *Williams* v. *Edwards,* 547 F. 2d 1206 (CA5 1977); *Gates* v. *Collier,* 501 F. 2d 1291 (CA5 1974); *Pugh* v. *Locke,* 406 F. Supp. 318 (MD Ala. 1976), aff'd as modified, 559 F. 2d 283 (CA5 1977), rev'd in part on other grounds, 438 U. S. 781 (1978) (*per curiam*).

ern Ohio Correctional Facility is in violation of the Eighth Amendment. I write separately, however, to emphasize that today's decision should in no way be construed as a retreat from careful judicial scrutiny of prison conditions, and to discuss the factors courts should consider in undertaking such scrutiny.

I

Although this Court has never before considered what prison conditions constitute "cruel and unusual punishment" within the meaning of the Eighth Amendment, see *ante*, at 344–345, such questions have been addressed repeatedly by the lower courts. In fact, individual prisons or entire prison systems in at least 24 States have been declared unconstitutional under the Eighth and Fourteenth Amendments,[1] with litiga-

---

[1] Among the States in which prisons or prison systems have been placed under court order because of conditions of confinement challenged under the Eighth and Fourteenth Amendments are: Alabama, see *Pugh* v. *Locke*, 406 F. Supp. 318 (MD Ala. 1976), aff'd as modified, 559 F. 2d 283 (CA5 1977), rev'd in part on other grounds, 438 U. S. 781 (1978) (*per curiam*); Arizona, see *Harris* v. *Cardwell*, No. CIV–75–185–PHX–CAM (DC Ariz., Oct. 14, 1980) (consent decree); Arkansas, see *Finney* v. *Mabry*, 458 F. Supp. 720 (ED Ark. 1978) (consent decree); Colorado, see *Ramos* v. *Lamm*, 639 F. 2d 559 (CA10 1980), cert. denied, 450 U. S. 1041 (1981); Delaware, see *Anderson* v. *Redman*, 429 F. Supp. 1105 (Del. 1977); Florida, see *Costello* v. *Wainwright*, 397 F. Supp. 20 (MD Fla. 1975), aff'd, 525 F. 2d 1239 (CA5), vacated on rehearing on other grounds, 539 F. 2d 547 (CA5 1976) (en banc), rev'd, 430 U. S. 325, aff'd on remand, 553 F. 2d 506 (CA5 1977) (en banc) (*per curiam*); Georgia, see *Guthrie* v. *Caldwell*, No. 3068 (SD Ga., Dec. 1, 1978) (consent decree); Illinois, see *Lightfoot* v. *Walker*, 486 F. Supp. 504 (SD Ill. 1980); Iowa, see *Watson* v. *Ray*, 90 F. R. D. 143 (SD Iowa 1981); Kentucky, see *Kendrick* v. *Bland*, No. 76–0079–P (WD Ky., Oct. 24, 1980) (consent decree); Louisiana, see *Williams* v. *Edwards*, 547 F. 2d 1206 (CA5 1977); Maryland, see *Johnson* v. *Levine*, 450 F. Supp. 648 (Md.), aff'd in part, 588 F. 2d 1378 (CA4 1978), and *Nelson* v. *Collins*, 455 F. Supp. 727 (Md.), aff'd in part, 588 F. 2d 1378 (CA4 1978); Mississippi, see *Gates* v. *Collier*, 501 F. 2d 1291 (CA5 1974); Missouri, see *Burks* v. *Teasdale*, 603 F. 2d 59 (CA8 1979); New Hampshire, see *Laaman* v. *Helgemoe*, 437 F. Supp. 269 (NH 1977);

tion underway in many others.[2]    Thus, the lower courts have learned from repeated investigation and bitter experience that judicial intervention is *indispensable* if constitutional dictates—not to mention considerations of basic humanity—are to be observed in the prisons.

No one familiar with litigation in this area could suggest that the courts have been overeager to usurp the task of running prisons, which, as the Court today properly notes, is entrusted in the first instance to the "legislature and prison administration rather than a court."    *Ante,* at 349.    And certainly, no one could suppose that the courts have ordered creation of "comfortable prisons," *ibid.,* on the model of country clubs.    To the contrary, "the soul-chilling inhumanity of conditions in American prisons has been thrust upon the judicial conscience."    *Inmates of Suffolk County Jail* v. *Eisenstadt,* 360 F. Supp. 676, 684 (Mass. 1973).

Judicial opinions in this area do not make pleasant reading.[3]    For example, in *Pugh* v. *Locke,* 406 F. Supp. 318 (MD

---

New Mexico, see *Duran* v. *Apodaca,* No. Civil 77–721–C (DC NM, July 17, 1980) (consent decree); New York, see *Todaro* v. *Ward,* 565 F. 2d 48 (CA2 1977); Ohio, see (in addition to this case) *Stewart* v. *Rhodes,* 473 F. Supp. 1185 (ED Ohio 1979); Oklahoma, see *Battle* v. *Anderson,* 564 F. 2d 388 (CA10 1977); Oregon, see *Capps* v. *Atiyeh,* 495 F. Supp. 802 (Ore. 1980); Pennsylvania, see *Hendrick* v. *Jackson,* 10 Pa. Commw. 392, 309 A. 2d 187 (1973); Rhode Island, see *Palmigiano* v. *Garrahy,* 443 F. Supp. 956 (RI 1977), remanded, 599 F. 2d 17 (CA1 1979); Tennessee, see *Trigg* v. *Blanton,* No. A–6047 (Ch. Ct., Davidson Cty., Aug. 23, 1978), vacated (Tenn. App., May 1, 1980) (for consideration of changes in conditions), appeal pending (Tenn. Sup. Ct.); Texas, see *Ruiz* v. *Estelle,* 503 F. Supp. 1265 (SD Tex. 1980).    See also *Feliciano* v. *Barcelo,* 497 F. Supp. 14 (PR 1979); *Barnes* v. *Government of Virgin Islands,* 415 F. Supp. 1218 (V. I. 1976).

[2] There are over 8,000 pending cases filed by inmates challenging prison conditions.    3 National Institute of Justice, American Prisons and Jails 34 (1980) (hereafter American Prisons and Jails).

[3] It behooves us to remember that

"it is impossible for a written opinion to convey the pernicious conditions and the pain and degradation which ordinary inmates suffer within [un-

Ala. 1976), aff'd as modified, 559 F. 2d 283 (CA5 1977), rev'd in part on other grounds, 438 U. S. 781 (1978) (*per curiam*), Chief Judge Frank Johnson described in gruesome detail the conditions then prevailing in the Alabama penal system. The institutions were "horrendously overcrowded," 406 F. Supp., at 322, to the point where some inmates were forced to sleep on mattresses spread on floors in hallways and next to urinals. *Id.*, at 323. The physical facilities were "dilapidat[ed]" and "filthy," the cells infested with roaches, flies, mosquitoes, and other vermin. *Ibid.* Sanitation facilities were limited and in ill repair, emitting an "overpowering odor"; in one instance over 200 men were forced to share one toilet. *Ibid.* Inmates were not provided with toothpaste, toothbrush, shampoo, shaving cream, razors, combs, or other such necessities. *Ibid.* Food was "unappetizing and unwholesome," poorly prepared and often infested with insects, and served without reasonable utensils. *Ibid.* There were no meaningful vocational, educational, recreational, or work programs. *Id., at* 326. A United States health officer described the prisons as "wholly unfit for human habitation according to virtually every criterion used for evaluation by public health inspectors." *Id.*, at 323–324. Perhaps the worst of all was the "rampant violence" within the prison. *Id.*, at 325. Weaker inmates were "repeatedly victimized" by the stronger; robbery, rape, extortion, theft, and assault were "everyday occurrences among the general inmate population." *Id.*, at 324.

---

constitutionally operated prisons]—the gruesome experiences of youthful first offenders forcibly raped; the cruel and justifiable fears of inmates, wondering when they will be called upon to defend the next violent assault; the sheer misery, the discomfort, the wholesale loss of privacy for prisoners housed with one, two, or three others in a forty-five foot cell or suffocatingly packed together in a crowded dormitory; the physical suffering and wretched psychological stress which must be endured by those sick' or injured who cannot obtain medical care . . . .

"For those who are incarcerated within [such prisons], these conditions and experiences form the content and essence of daily existence." *Ruiz* v. *Estelle, supra*, at 1391.

Faced with this record, the court—not surprisingly—found that the conditions of confinement constituted cruel and unusual punishment, and issued a comprehensive remedial order affecting virtually every aspect of prison administration.[4]

Unfortunately, the Alabama example is neither abberational nor anachronistic. Last year, in *Ramos* v. *Lamm,* 639 F. 2d 559 (1980), cert. denied, 450 U. S. 1041 (1981), for example, the Tenth Circuit declared conditions in the maximum-security unit of the Colorado State Penitentiary at Canon City unconstitutional. The living areas of the prison were "unfit for human habitation," 639 F. 2d, at 567; the food unsanitary and "grossly inadequate," *id.,* at 570; the institution "fraught with tension and violence," often leading to injury and death, *id.,* at 572; the health care "blatant[ly] inadequat[e]" and "appalling," *id.,* at 574; and there were various restrictions of prisoners' rights to visitation, mail, and access to courts in violation of basic constitutional rights, *id.,* at 578–585. Similar tales of horror are recounted in dozens of other cases. See, *e. g.,* cases cited in n. 1, *supra.*

Overcrowding and cramped living conditions are particularly pressing problems in many prisons. Out of 82 court orders in effect concerning conditions of confinement in federal and state correctional facilities as of March 31, 1978, 26 involved the issue of overcrowding. 3 American Prisons and Jails 32. Two-thirds of all inmates in federal, state, and local correctional facilities were confined in cells or dormitories providing less than 60 square feet per person—the minimal standard deemed acceptable by the American Public Health Association, the Justice Department, and other authorities.[5]

---

[4] This Court has upheld the exercise of wide discretion by trial courts to correct conditions of confinement found to be unconstitutional. *Hutto* v. *Finney,* 437 U. S. 678, 687–688 (1978).

[5] See American Public Health Assn., Standards for Health Services in Correctional Institutions 62 (1976); U. S. Dept. of Justice Federal Standards for Prisons and Jails, Standard No. 2.04, p. 17 (1980); see generally 3 American Prisons and Jails 39–50, 85, n. 6.

The problems of administering prisons within constitutional standards are indeed " 'complex and intractable,' " *ante,* at 351, n. 16, quoting *Procunier* v. *Martinez,* 416 U. S. 396, 404 (1974), but at their core is a lack of resources allocated to prisons. Confinement of prisoners is unquestionably an expensive proposition: the average direct current expenditure at adult institutions in 1977 was $5,461 per inmate, 3 American Prisons and Jails 115; the average cost of constructing space for an additional prisoner is estimated at $25,000 to $50,000. *Id.,* at 119. Oftentimes, funding for prisons has been dramatically below that required to comply with basic constitutional standards. For example, to bring the Louisiana prison system into compliance required a supplemental appropriation of $18,431,622 for a single year's operating expenditures, and of $105,605,000 for capital outlays. *Williams* v. *Edwards,* 547 F. 2d 1206, 1219–1221 (CA5 1977) (Exhibit A).

Over the last decade, correctional resources, never ample, have lagged behind burgeoning prison populations. In *Ruiz* v. *Estelle,* 503 F. Supp. 1265 (SD Tex. 1980), for example, the court stated that an "unprecedented surge" in the number of inmates has "undercut any realistic expectation" of eliminating double and triple celling, despite construction of a new $43 million unit. *Id.,* at 1280–1281. The number of inmates in federal and state correctional facilities has risen 42% since 1975, and last year grew at its fastest rate in three years. Krajick, The Boom Resumes, 7 Corrections Magazine 16–17 (Apr. 1981) (report of annual survey of prison populations).[6] A major infusion of money would be required merely to keep pace with prison populations.

---

[6] Among the causes of the rising number of prison inmates are increasing population, increasing crime rates, stiffer sentencing provisions, and more restrictive parole practices. See Krajick, The Boom Resumes, 7 Corrections Magazine 16–17 (Apr. 1981); 3 National Institute of Law Enforcement and Criminal Justice, The National Manpower Survey of the Criminal Justice System 13–14 (1978).

Public apathy and the political powerlessness of inmates have contributed to the pervasive neglect of the prisons. Chief Judge Henley observed that the people of Arkansas "knew little or nothing about their penal system" prior to the *Holt* litigation, despite "sporadic and sensational" exposés. *Holt* v. *Sarver*, 309 F. Supp. 362, 367 (ED Ark. 1970). Prison inmates are "voteless, politically unpopular, and socially threatening." Morris, The Snail's Pace of Prison Reform, in Proceedings of the 100th Annual Congress of Corrections of the American Correctional Assn. 36, 42 (1970). Thus, the suffering of prisoners, even if known, generally "moves the community in only the most severe and exceptional cases." *Ibid.* As a result even conscientious prison officials are "[c]aught in the middle," as state legislatures refuse "to spend sufficient tax dollars to bring conditions in outdated prisons up to minimally acceptable standards." *Johnson* v. *Levine*, 450 F. Supp. 648, 654 (Md.), aff'd in part, 588 F. 2d 1378 (CA4 1978).[7] After extensive exposure to this

---

[7] Moreover, part of the problem in some instances is the attitude of politicians and officials. Of course, the courts should not "*assume* that state legislatures and prison officials are insensitive to the requirements of the Constitution," *ante*, at 352 (emphasis added), but sad experience has shown that sometimes they can *in fact* be insensitive to such requirements. See Civil Rights of the Institutionalized, Hearings on S. 10 before the Subcommittee on the Constitution of the Senate Committee on the Judiciary, 96th Cong., 1st Sess., 28 (1979) (testimony of Assistant Attorney General Drew Days); *Palmigiano* v. *Garrahy*, 448 F. Supp. 659, 671 (RI 1978) (prison officials failed to implement court order for reasons unrelated to ability to comply). William G. Nagel, a New Jersey corrections official for 11 years and now a frequent expert witness in prison litigation, testified in 1977 that, in every one of the 17 lawsuits in which he had participated, the government officials worked in a "systematic way" to "impede the fulfillment of constitutionality within our institutions." Civil Rights of Institutionalized Persons, Hearing on S. 1393 before the Subcommittee on the Constitution of the Senate Committee on the Judiciary, 95th Cong., 1st Sess., 772 (1977). He stated that he had "learned through experience that most States resist correcting their unconstitutional conditions or operations until pressed to do so by threat of a suit or by direc-

process, Chief Judge Pettine came to view the "barbaric physical conditions" of Rhode Island's prison system as "the ugly and shocking outward manifestations of a deeper dysfunction, an attitude of cynicism, hopelessness, predatory selfishness, and callous indifference that appears to infect, to one degree or another, almost everyone who comes in contact with the [prison]." *Palmigiano* v. *Garrahy,* 443 F. Supp. 956, 984 (RI 1977), remanded, 599 F. 2d 17 (CA1 1979).

Under these circumstances, the courts have emerged as a critical force behind efforts to ameliorate inhumane conditions. Insulated as they are from political pressures, and charged with the duty of enforcing the Constitution, courts are in the strongest position to insist that unconstitutional conditions be remedied, even at significant financial cost. JUSTICE BLACKMUN, then serving on the Court of Appeals, set the tone in *Jackson* v. *Bishop,* 404 F. 2d 571, 580 (CA8 1968): "Humane considerations and constitutional requirements are not, in this day, to be measured or limited by dollar considerations . . . ."

Progress toward constitutional conditions of confinement in the Nation's prisons has been slow and uneven, despite judicial pressure. Nevertheless, it is clear that judicial intervention has been responsible, not only for remedying some of the worst abuses by direct order, but also for "forcing the legislative branch of government to reevaluate correction policies and to appropriate funds for upgrading penal systems." 3 American Prisons and Jails 163. A detailed study of four prison conditions cases by the American Bar Association concluded:

"The judicial intervention in each of the correctional

tive from the judiciary." *Id.,* at 779. Indeed, this Court recognized the problem of obstructionist official behavior when it affirmed an award of attorney's fees against Arkansas prison officials who had failed to comply with a court order, on the ground that the litigation had been conducted in bad faith. *Hutto* v. *Finney,* 437 U. S., at 689–693.

law cases studied had impact that was broad and substantial. . . . For the most part, the impact of the judicial intervention was clearly beneficial to the institutions, the correctional systems, and the broader community. Dire consequences predicted by some correctional personnel did not accompany the judicial intervention in the cases studied. Inmates were granted greater rights and protections, but the litigation did not undermine staff authority and control. Institutional conditions improved, but facilities were not turned into 'country clubs.' The courts intervened in correctional affairs, but the judges did not take over administration of the facilities." M. Harris & D. Spiller, After Decision: Implementation of Judicial Decrees in Correctional Settings 21 (National Institute of Law Enforcement and Criminal Justice, 1977).

Even prison officials have acknowledged that judicial intervention has helped them to obtain support for needed reform. GAO, Comptroller General, Report to Congress: The Department of Justice Can Do More to Help Improve Conditions at State and Local Correctional Facilities 12–13 (GGD–80–77, 1980). The Commissioner of Corrections of New York City, a defendant in many lawsuits challenging jail and prison conditions, has stated: "Federal courts may be the last resort for us . . . . If there's going to be change, I think the federal courts are going to have to force cities and states to spend more money on their prisons. . . . I look on the courts as a friend." Gettinger, "Cruel and Unusual" Prisons, 3 Corrections Magazine 3, 5 (Dec. 1977). In a similar vein, the Commissioner of the Minnesota Department of Corrections testified before a congressional Committee that lawsuits brought on behalf of prison inmates

"have upgraded correctional institutions and the development of procedural safeguards regarding basic constitutional rights. There is no question in my mind that

had such court intervention not taken place, these fundamental improvements would not have occurred.

.      .      .      .      .

"While I do not intend to imply here that I sit expectantly at my desk each week awaiting news of another impending suit, I do recognize that unless my agency consistently deals fairly with those incarcerated in our institutions we will be held judicially accountable." Civil Rights of Institutionalized Persons, Hearings on S. 1393 before the Subcommittee on the Constitution of the Senate Committee on the Judiciary, 95th Cong., 1st Sess., 409–410 (1977) (testimony of Kenneth F. Schoen).[8]

## II

The task of the courts in cases challenging prison conditions is to "determine whether a challenged punishment comports with human dignity." *Furman* v. *Georgia,* 408 U. S. 238, 282 (1972) (BRENNAN, J., concurring). Such determinations are necessarily imprecise and indefinite, *Trop* v. *Dulles,* 356 U. S. 86, 100–101 (1958); *Wilkerson* v. *Utah,* 99 U. S. 130, 135–136 (1879); they require careful scrutiny of challenged conditions, and application of realistic yet humane standards.

In performing this responsibility, this Court and the lower

---

[8] After extensive hearings concerning the effect of court litigation on the correction of unconstitutional conditions in state-operated institutions, Congress emphatically endorsed the role of the courts in the area by passing the Civil Rights of Institutionalized Persons Act, Pub. L. 96–247, 94 Stat. 349, 42 U. S. C. § 1997 *et seq.* (1976 ed., Supp. IV), which authorized the Attorney General to bring suits in federal court on behalf of persons institutionalized by the States under unconstitutional conditions. The Conference Committee noted that, as a result of litigation in which the Justice Department had participated, "conditions have improved significantly in dozens of institutions across the Nation: . . . barbaric treatment of adult and juvenile prisoners has been curbed; . . . and States facing the prospect of suit by the Attorney General have voluntarily upgraded conditions in their institutions . . . to comply with previously announced constitutional standards." H. R. Conf. Rep. No. 96–897, p. 9 (1980).

courts have been especially deferential to prison authorities "in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell* v. *Wolfish,* 441 U. S. 520, 547 (1979); see also *ante,* at 351, n. 16; *Jones* v. *North Carolina Prisoners' Labor Union,* 433 U. S. 119, 128 (1977); *Cruz* v. *Beto,* 405 U. S. 319, 321 (1972). Many conditions of confinement, however, including overcrowding, poor sanitation, and inadequate safety precautions, arise from neglect rather than policy. See *supra,* at 358–359. There is no reason of comity, judicial restraint, or recognition of expertise for courts to defer to negligent omissions of officials who lack the resources or motivation to operate prisons within limits of decency. Courts must and do recognize the primacy of the legislative and executive authorities in the administration of prisons; however, if the prison authorities do not conform to constitutional minima, the courts are under an obligation to take steps to remedy the violations. *Procunier* v. *Martinez,* 416 U. S., at 405.[9]

The first aspect of judicial decisionmaking in this area is scrutiny of the actual conditions under challenge. It is important to recognize that various deficiencies in prison conditions "must be considered together." *Holt* v. *Sarver,* 309 F. Supp., at 373. The individual conditions "exist in combination; each affects the other; and taken together they [may] have a cumulative impact on the inmates." *Ibid.* Thus, a court considering an Eighth Amendment challenge to condi-

---

[9] See also *Cruz* v. *Beto,* 405 U. S. 319, 321 (1972):

"Federal courts sit not to supervise prisons but to enforce the constitutional rights of all 'persons,' including prisoners. We are not unmindful that prison officials must be accorded latitude in the administration of prison affairs, and that prisoners necessarily are subject to appropriate rules and regulations. But persons in prison, like other individuals, have the right to petition the Government for redress of grievances which, of course, includes 'access of prisoners to the courts for the purpose of presenting their complaints.'"

tions of confinement must examine the totality of the circumstances.[10] Even if no single condition of confinement would be unconstitutional in itself, "exposure to the cumulative effect of prison conditions may subject inmates to cruel and unusual punishment." *Laaman* v. *Helgemoe,* 437 F. Supp. 269, 322–323 (NH 1977).

Moreover, in seeking relevant information about conditions in a prison, the court must be open to evidence and assistance from many sources, including expert testimony and studies on the effect of particular conditions on prisoners. For this purpose, public health, medical, psychiatric, psychological, penological, architectural, structural, and other experts have proved useful to the lower courts in observing and interpreting prison conditions. See, *e. g., Palmigiano* v. *Garrahy,* 443 F. Supp., at 960 (commenting that the court's "task was made easier by the extensive assistance of experts").[11]

More elusive, perhaps, is the second aspect of the judicial inquiry: application of realistic yet humane standards to the conditions as observed. Courts have expressed these standards in various ways, see, *e. g., M. C. I. Concord Advisory Bd.* v. *Hall,* 447 F. Supp. 398, 404 (Mass. 1978) ("contemporary standards of decency"); *Palmigiano* v. *Garrahy, supra,* at 979 (conditions so bad as to "shock the conscience of any reasonable citizen"); *Estelle* v. *Gamble,* 429 U. S. 97, 102 (1976) (" 'broad and idealistic concepts of dignity, civilized standards, humanity, and decency,' " quoting *Jackson* v. *Bishop,* 404 F.

---

[10] The Court today adopts the totality-of-the-circumstances test. See *ante,* at 347 (Prison conditions *"alone or in combination,* may deprive inmates of the minimal civilized measure of life's necessities") (emphasis added). See also *Hutto* v. *Finney,* 437 U. S., at 687 ("We find no error in the court's conclusion that, *taken as a whole,* conditions in the isolation cells continued to violate the prohibition against cruel and unusual punishment") (emphasis added).

[11] I do not understand the Court's opinion to disparage use of experts to assist the courts in these functions. Indeed, the Court acknowledges that expert opinion may be "helpful and relevant" in some circumstances. *Ante,* at 348, n. 13.

2d, at 579). Each of these descriptions has its merit, but in the end, the court attempting to apply them is left to rely upon its own experience and on its knowledge of contemporary standards.[12] *Coker v. Georgia,* 433 U. S. 584, 597 (1977) (plurality opinion).

In determining when prison conditions pass beyond legitimate punishment and become cruel and unusual, the "touchstone is the effect upon the imprisoned." *Laaman v. Helgemoe,* 437 F. Supp., at 323. The court must examine the effect upon inmates of the condition of the physical plant (lighting, heat, plumbing, ventilation, living space, noise levels, recreation space); sanitation (control of vermin and insects, food preparation, medical facilities, lavatories and showers, clean places for eating, sleeping, and working); safety (protection from violent, deranged, or diseased inmates, fire protection, emergency evacuation); inmate needs and services (clothing, nutrition, bedding, medical, dental, and mental health care, visitation time, exercise and recreation, educational and rehabilitative programming); and staffing (trained and adequate guards and other staff, avoidance of placing inmates in positions of authority over other inmates). See *ibid.; Ramos v. Lamm,* 639 F. 2d, at 567–581. When "the cumulative impact of the conditions of incarceration threatens the physical, mental, and emotional health and well-being of the inmates and/or creates a probability of recidivism and future incarceration," the court must conclude that the conditions violate the Constitution. *Laaman v. Helgemoe, supra,* at 323.

---

[12] Again, the assistance of experts can be of great value to courts when evaluating standards for confinement. Although expert testimony alone does not "suffice to establish contemporary standards of decency," *ibid.,* such testimony can help the courts to understand the prevailing norms against which conditions in a particular prison may be evaluated. In this connection, the work of standard-setting organizations such as the Department of Justice, the American Public Health Association, the Commission on Accreditation for Corrections, and the National Sheriff's Association is particularly valuable.

## III

A reviewing court is generally limited in its perception of a case to the findings of the trial court. I have not seen the Southern Ohio Correctional Facility at Lucasville, nor have I directly heard evidence concerning conditions there. From the District Court opinion, I know that the prison is a modern, "top-flight, first-class facility," built in the early 1970's at a cost of some $32 million, 434 F. Supp. 1007, 1009 (SD Ohio 1977). Chief Judge Hogan, who toured the facility, described it as "not lacking in color," and, "generally speaking, . . . quite light and . . . airy, etc." *Id.*, at 1011. The cells are reasonably well furnished, with one cabinet-type night stand, one wall cabinet, one wall shelf, one wall-mounted lavatory with hot and cold running water and steel mirror, one china commode flushed from inside the cell, one wall-mounted radio, one heating and air circulation vent, one lighting fixture, and one bed or bunkbed. *Id.*, at 1011–1012. Prisoners in each cellblock have frequent access to a dayroom, which is "in a sense part of the cells," and is "designed to furnish that type of recreation or occupation which an ordinary citizen would seek in his living room or den." *Id.*, at 1012. Food is "adequate in every respect," and the kitchens and dining rooms are clean. *Id.*, at 1014. Prisoners are all permitted contact visitation. *Ibid.* The ratio of inmates to guards is "well within the acceptable ratio," and incidents of violence, while not uncommon, have not increased out of proportion to inmate population. *Id.*, at 1014–1015, 1016–1018. Plumbing and lighting are adequate. *Id.*, at 1015. The prison has a modern, well-stocked library, with an adequate law library. *Id.*, at 1010, and n. 2. It has eight schoolrooms, two chapels, a commissary, a barbershop, dining rooms, kitchens, and workshops. *Ibid.* Virtually the only serious complaint of the inmates at the Southern Ohio Correctional Facility is that 1,280 of the 1,620 cells are used to house two inmates.

I have not the slightest doubt that 63 square feet of cell space is not enough for two men. I understand that every major study of living space in prisons has so concluded. See *id.,* at 1021; see also n. 5, *supra; post,* at 371–372, and n. 4 (MARSHALL, J., dissenting). That prisoners are housed under such conditions is an unmistakable signal to the legislators and officials of Ohio: either more prison facilities should be built or expanded, or fewer persons should be incarcerated in prisons. Even so, the findings of the District Court do not support a conclusion that the conditions at the Southern Ohio Correctional Facility—cramped though they are—constitute cruel and unusual punishment. See *Hite* v. *Leeke,* 564 F. 2d 670, 673–674 (CA4 1977); *M. C. I. Concord Advisory Bd.* v. *Hall,* 447 F. Supp., at 404–405.[13]

The "touchstone" of the Eighth Amendment inquiry is "'the effect upon the imprisoned.'" *Supra,* at 364, quoting *Laaman* v. *Helgemoe,* 437 F. Supp., at 323. The findings of the District Court leave no doubt that the prisoners are adequately sheltered, fed, and protected, and that opportunities for education, work, and rehabilitative assistance are available.[14] One need only compare the District Court's descrip-

---

[13] The District Court rested its judgment on five considerations: (1) the long-term confinement of the prisoners, (2) the rated capacity of the prison, (3) expert opinion concerning living-space requirements, (4) time spent in the cells, and (5) the permanent character of the double celling. 434 F. Supp. 1007, 1020–1021 (SD Ohio 1977). This led the Court of Appeals to conclude that the District Court had not ruled the practice of double celling "unconstitutional under all circumstances." App. to Pet. for Cert. A–2. The five considerations cited by the District Court, in my view, are not *separate* aspects of conditions at the prison; rather, they merely embroider upon the theme that double celling is unconstitutional in itself.

[14] The overcrowding in the cells is mitigated considerably by the freedom of most prisoners to spend time away from their cells, especially in the dayrooms. The inhabitants of 960 of the double-occupant cells were out of the cells some 10 hours a day at school, work, or other activities. 434 F. Supp., at 1013. Of the remainder, all of whom spent six or fewer hours a week out of the cells, some were on short-term "receiving" status, some

tion of conditions at the Southern Ohio Correctional Facility with descriptions of other major state and federal facilities, see *supra,* at 354–356, to realize that this prison, crowded though it is, is one of the better, more humane large prisons in the Nation.[15]

The consequence of the District Court's order might well be to make life worse for many Ohio inmates, at least in the short run. As a result of the order, some prisoners have been transferred to the Columbus Correctional Facility, a deteriorating prison nearly 150 years old, itself the subject of litigation over conditions of confinement and under a preliminary order enjoining racially segregative and punitive practices. See *Stewart* v. *Rhodes,* 473 F. Supp. 1185 (SD Ohio 1979).

The District Court may well be correct *in the abstract* that prison overcrowding and double celling such as existed at the Southern Ohio Correctional Facility generally results in serious harm to the inmates. But cases are not decided in the abstract. A court is under the obligation to examine the *actual effect* of challenged conditions upon the well-being of the prisoners.[16] The District Court in this case was unable to identify any actual signs that the double celling at the

---

on semiprotected status by choice, and some on "idle" status by choice. *Ibid.* The remainder were in administrative isolation because of infractions of the rules, determined after a plenary hearing. *Ibid.*

During trial in this case, and before final judgment by the District Court, the prison implemented a plan limiting double celling to those inmates free to move about the facility 15 hours per day. Brief for Petitioners 27.

[15] If it were true that any prison providing less than 63 square feet of cell space per inmate were a *per se* violation of the Eighth Amendment, then approximately two-thirds of all federal, state, and local inmates today would be unconstitutionally confined. See *supra,* at 356.

[16] This is not to say that injury to the inmates from challenged prison conditions must be "demonstrate[d] with a high degree of specificity and certainty." *Ruiz* v. *Estelle,* 503 F. Supp., at 1286. Courts may, as usual, employ common sense, observation, expert testimony, and other practical modes of proof. See *id.,* at 1286–1287.

Southern Ohio Correctional Facility has seriously harmed the inmates there;[17] indeed, the court's findings of fact suggest that crowding at the prison has not reached the point of causing serious injury. Since I cannot conclude that the totality of conditions at the facility offends constitutional norms, and am of the view that double celling in itself is not *per se* impermissible, I concur in the judgment of the Court.

JUSTICE BLACKMUN, concurring in the judgment.

Despite the perhaps technically correct observation, *ante,* at 344–345, that the Court is "consider[ing] here for the first time the limitation that the Eighth Amendment . . . imposes upon the conditions in which a State may confine those convicted of crimes," it obviously is not writing upon a clean slate. See *Hutto* v. *Finney,* 437 U. S. 678, 685–688 (1978); cf. *Bell* v. *Wolfish,* 441 U. S. 520 (1979). Already, concerns about prison conditions and their constitutional significance have been expressed by the Court.

*Jackson* v. *Bishop,* 404 F. 2d 571 (CA8 1968), cited by both JUSTICE BRENNAN, and by JUSTICE MARSHALL in dissent here, was, I believe, one of the first cases in which a federal court examined state penitentiary practices and held them to be violative of the Eighth Amendment's proscription of "cruel and unusual punishments." I sat on that appeal, and I was

---

[17] Cf. *Capps* v. *Atiyeh,* 495 F. Supp., at 810–814 (evidence "replete with examples of the deleterious effects of overcrowding on prisoners' mental and physical health," including increased health risks, diminished access to essential services, fewer opportunities to engage in rehabilitative programs, levels of privacy and quiet insufficient for psychological well-being, and exacerbated levels of tension, anxiety, and fear); *Anderson* v. *Redman,* 429 F. Supp., at 1112–1118 (court found that overcrowding had caused severe physical and psychological damage to inmates, increased the incidence of self-multilation, suicide, attempted suicide, theft, assault, and homosexual rape, destroyed all privacy, overtaxed the sanitary facilities, exacerbated the problems of filth, noise, and vermin, caused serious deterioration in medical care, fostered increased idleness, broke down the classification and incentive systems, and demoralized the staff).

privileged to write the opinion for a unanimous panel of the court. My voting in at least one prison case since then further discloses my concern about the conditions that sometimes are imposed upon confined human beings. See, *e. g.,* *United States* v. *Bailey,* 444 U. S. 394, 419, 424 (1980) (dissenting opinion).

I perceive, as JUSTICE BRENNAN obviously does in view of his separate writing, a possibility that the Court's opinion in this case today might be regarded, because of some of its language, as a signal to prison administrators that the federal courts now are to adopt a policy of general deference to such administrators and to state legislatures, deference not only for the purpose of determining contemporary standards of decency, *ante,* at 346, but for the purpose of determining whether conditions at a particular prison are cruel and unusual within the meaning of the Eighth Amendment, *ante,* at 349–352. That perhaps was the old attitude prevalent several decades ago. I join JUSTICE BRENNAN's opinion because I, too, feel that the federal courts must continue to be available to those state inmates who sincerely claim that the conditions to which they are subjected are violative of the Amendment. The Court properly points out in its opinion, *ante,* at 347, that incarceration necessarily, and constitutionally, entails restrictions, discomforts, and a loss of privileges that complete freedom affords. But incarceration is not an open door for unconstitutional cruelty or neglect. Against that kind of penal condition, the Constitution and the federal courts, it is to be hoped, together remain as an available bastion.

JUSTICE MARSHALL, dissenting.

From reading the Court's opinion in this case, one would surely conclude that the Southern Ohio Correctional Facility (SOCF) is a safe, spacious prison that happens to include many two-inmate cells because the State has determined that that is the best way to run the prison. But the facility

described by the majority is not the one involved in this case. SOCF is overcrowded, unhealthful, and dangerous. None of those conditions results from a considered policy judgment on the part of the State. Until the Court's opinion today, absolutely no one—certainly not the "state legislatures" or "prison officials" to whom the majority suggests, see *ante,* at 352, that we defer in analyzing constitutional questions—had suggested that forcing long-term inmates to share tiny cells designed to hold only one individual might be a good thing. On the contrary, as the District Court noted, "everybody" is in agreement that double celling is undesirable.[1] No one argued at trial and no one has contended here that double celling was a legislative policy judgment. No one has asserted that prison officials imposed it as a disciplinary or a security matter. And no one has claimed that the practice has anything whatsoever to do with "punish[ing] justly," "deter[ring] future crime," or "return[ing] imprisoned persons to society with an improved chance of being useful, law-abiding citizens." See *ante,* at 352. The evidence and the District Court's findings clearly demonstrate that the *only* reason double celling was imposed on inmates at SOCF was that more individuals were sent there than the prison was ever designed to hold.[2]

I do not dispute that the state legislature indeed made policy judgments when it built SOCF. It decided that Ohio needed a maximum-security prison that would house some 1,600 inmates. In keeping with prevailing expert opinion, the legislature made the further judgments that each inmate would have his own cell and that each cell would have approximately 63 square feet of floor space. But because of prison overcrowding, hundreds of the cells are shared, or "doubled," which is hardly what the legislature intended.

---

[1] "The experts were all in agreement—as is everybody—that single celling is desirable." 434 F. Supp. 1007, 1016 (SD Ohio 1977).

[2] See *id.,* at 1010–1011.

In a doubled cell, each inmate has only some 30–35 square feet of floor space.[3] Most of the windows in the Supreme Court building are larger than that. The conclusion of every expert who testified at trial and of every serious study of which I am aware is that a long-term inmate must have to himself, at the very least, 50 square feet of floor space—an area smaller than that occupied by a good-sized automobile—in order to avoid serious mental, emotional, and physical deterioration.[4] The District Court found that as a fact. 434

[3] The bed alone, which is bunk-style in the doubled cells, takes up approximately 20 square feet. Thus the actual amount of floor space per inmate, without making allowance for any other furniture in the room, is some 20–24 square feet, an area about the size of a typical door.

[4] See, e. g., American Public Health Assn., Standard for Health Services in Correctional Institutions 62 (1976) ("a minimum of 60 sq. ft."); Commission on Accreditation for Corrections, Manual of Standards for Adult Correctional Institutions 27 (1977) ("a floor area of at least 60 square feet"; "[i]n no case should the present use of the facility exceed designed use standards"); 3 National Institute of Justice, American Prisons and Jails 85, n. 6 (1980) ("80 square feet of floor space in long-term institutions"); National Sheriffs' Assn., A Handbook on Jail Architecture 63 (1975) ("[s]ingle occupancy detention rooms should average 70 to 80 square feet in area"); U. S. Dept. of Justice, Federal Standards for Prisons and Jails 17 (1980) ("at least 60 square feet of floor space"); National Council on Crime and Delinquency, Model Act for the Protection of Rights of Prisoners, 18 Crime & Delinquency 4, 10 (1972) ("not less than fifty square feet of floor space in any confined sleeping area"). Most of these studies recommend even more space for inmates who must spend more than 10 hours per day in their cells. One expert witness, a former warden of Rikers Island, testified from his experience that the double celling, if continued over "an awful long stretch of time," could be expected to lead to "assault behavior" and "homosexual occurrences." Tr. 48. He added that "skid row bums" in Bowery flophouses tend to live in healthier surroundings than do double-celled inmates. *Id.*, at 55. As will become apparent, the majority and I disagree over the weight to be given these studies and the expert testimony. But I emphasize that the majority has not pointed to a single witness or study refuting or even contradicting the conclusion of panel after panel of experts that an inmate needs as an absolute minimum 50 square feet of floor space to himself to avoid deterioration of his health.

F. Supp. 1007, 1020–1021 (SD Ohio 1977). Even petitioners, in their brief in this Court, concede that double celling as practiced at SOCF is "less than desirable." Brief for Petitioners 17.

The Eighth Amendment "embodies 'broad and idealistic concepts of dignity, civilized standards, humanity, and decency,' " against which conditions of confinement must be judged. *Estelle* v. *Gamble,* 429 U. S. 97, 102 (1976), quoting *Jackson* v. *Bishop,* 404 F. 2d 571, 579 (CA8 1968). Thus the State cannot impose punishment that violates "the evolving standards of decency that mark the progress of a maturing society." *Trop* v. *Dulles,* 356 U. S. 86, 101 (1958) (plurality opinion). For me, the legislative judgment and the consistent conclusions by those who have studied the problem provide considerable evidence that those standards condemn imprisonment in conditions so crowded that serious harm will result. The record amply demonstrates that those conditions are present here. It is surely not disputed that SOCF is severely overcrowded. The prison is operating at 38% above its design capacity.[5] It is also significant that

---

[5] In my dissenting opinion in *Bell* v. *Wolfish,* 441 U. S. 520, 572, n. 12 (1979), I pointed out that the majority ignored "the rated capacity of the institution" in determining whether the challenged overcrowding was unconstitutional. In its opinion today, the Court at least mentions that SOCF is operating at 38% above its rated capacity, but it dismisses that rating as "[p]erhaps" reflecting "an aspiration toward an ideal environment for long-term confinement." *Ante,* at 349. "The question before us," the majority adds, "is not whether the designer of SOCF guessed incorrectly about future prison population, but whether the actual conditions of confinement at SOCF are cruel and unusual." *Ante,* at 350–351, n. 15. Rated capacity, the majority argues, is irrelevant because of the numerous factors that influence prison population. Actually, it is the factors that influence prison population that are irrelevant. By definition, rated capacity represents "the number of inmates that a confinement unit, facility, or entire correctional agency can hold." 3 National Institute of Justice, American Prisons and Jails 41–42 (1980). If prison population, for whatever reason, exceeds rated capacity, then the prison must accommodate more people than it is designed to hold—in short, it is over-

some two-thirds of the inmates at SOCF are serving lengthy or life sentences, for, as we have said elsewhere, "the length of confinement cannot be ignored in deciding whether the confinement meets constitutional standards." *Hutto* v. *Finney,* 437 U. S. 678, 686 (1978). Nor is double celling a short-term response to a temporary problem. The trial court found, and it is not contested, that double celling, if not enjoined, will continue for the foreseeable future. The trial court also found that most of the double-celled inmates spend most of their time in their cells.[6]

crowded. And the greater the proportion by which prison population exceeds rated capacity, the more severe the overcrowding. I certainly do not suggest that rated capacity is the only factor to be considered in determining whether a prison is unconstitutionally overcrowded, but I fail to understand why the majority feels free to dismiss it entirely.

[6] Although the majority suggests, *ante,* at 344, n. 8, that this finding lacks a clear basis, the trial court also found as a fact that most inmates are out of their cells only 10 hours each day. 434 F. Supp., at 1013. This leaves 14 hours per day inside the cell. The trial court also found that a "substantial number" of inmates are out of their cells for no more than four to six hours *per week. Id.,* at 1021.

The majority assumes, *ante,* at 350, n. 15, that the trial court's finding that most inmates are out of their cells only 10 hours each day is "flatly inconsistent" with its finding that regulations permit most inmates to be out of their cells up to 14 hours each day. The majority goes on to reject the first finding in favor of the second. A more reasonable course would be to read these two findings in such a way as to give meaning to both. Thus I read the District Court's opinion as finding that although most inmates are permitted to be out of their cells up to 14 hours each day, conditions in the prison are such that many choose not to do so.

The majority also attaches importance to the fact that the inmates who are locked in their cells for all but four to six hours a week are in a "restrictive classification." *Ibid.* It is not clear to me why this matters. The inmates who are out of their cells only four to six hours each week are in three categories: "receiving," a category in which new inmates are placed for "a couple of weeks"; "voluntarily idle," which presumably means what it says; and "limited activity," for those inmates who have requested, but have not received, protective custody. It is not immediately apparent why classification in any of these categories justifies

It is simply not true, as the majority asserts, that "there is no evidence that double celling under these circumstances either inflicts unnecessary or wanton pain or is grossly disproportionate to the severity of crimes warranting imprisonment." *Ante,* at 348. The District Court concluded from the record before it that long exposure to these conditions will *"necessarily"* involve "excess limitation of general movement as well as physical and mental injury . . . ." 434 F. Supp., at 1020 (emphasis added).[7] And of course, of all the judges who have been involved in this case, the trial judge is the only one who has actually visited the prison. That is simply an additional reason to give in this case the

imposition of otherwise cruel and ususual punishment. In particular, the State surely lacks authority to force an individual to choose between possibility of rape or other physical harm (the presumed reason for the request for protective custody) and unconstitutionally cramped quarters. The majority asserts, incorrectly, that some of these inmates have committed rule infractions. *Ibid.* In fact, inmates who commit infractions are out of their cells only *two* hours each week. 434 F. Supp., at 1013. Although this dissent has not addressed their particular plight, it is beyond question that if punishment is cruel and unusual, then the mere fact that an individual prisoner has committed a rule infraction does not warrant its imposition. See *Hutto* v. *Finney,* 437 U. S. 678, 685–688 (1978).

[7] In its findings, the District Court credited expert testimony that "close quarters" would likely increase the incidence of schizophrenia and other mental disorders and that the double celling imposed in this case had led to increases in tension and in "aggressive and anti-social characteristics." 434 F. Supp., at 1017. There is no dispute that the prison was violent even before it became overcrowded, and that it has become more so. Contrary to the contention by the majority, *ante,* at 349–350, n. 15, I do not assert that violence has increased due to *double celling.* I accept the finding of the District Court that violence has increased due to *overcrowding.* See 434 F. Supp., at 1018. Plainly, this case involves much more than just the constitutionality of double celling *per se.* Other federal courts faced with overcrowded conditions have reached similar conclusions. See, *e. g., Campbell* v. *McGruder,* 188 U. S. App. D. C. 258, 273, 580 F. 2d 521, 536 (1978); *Battle* v. *Anderson,* 564 F. 2d 388, 399–401 (CA10 1977); *Detainees of Brooklyn House of Detention* v. *Malcolm,* 520 F. 2d 392, 396, 399 (CA2 1975).

deference we have always accorded to the careful conclusions of the finder of fact.  There is not a shred of evidence to suggest that anyone who has given the matter serious thought has ever approved, as the majority does today, conditions of confinement such as those present at SOCF.  I see no reason to set aside the concurrent conclusions of two courts that the overcrowding and double celling here in issue are sufficiently severe that they will, if left unchecked, cause deterioration in respondents' mental and physical health.  These conditions in my view go well beyond contemporary standards of decency and therefore violate the Eighth and Fourteenth Amendments.  I would affirm the judgment of the Court of Appeals.

If the majority did no more than state its disagreement with the courts below over the proper reading of the record, I would end my opinion here.  But the Court goes further, adding some unfortunate dicta that may be read as a warning to federal courts against interference with a State's operation of its prisons.  If taken too literally, the majority's admonitions might eviscerate the federal courts' traditional role of preventing a State from imposing cruel and unusual punishment through its conditions of confinement.

The majority concedes that federal courts "certainly have a responsibility to scrutinize claims of cruel and unusual confinement," *ante,* at 352, but adds an apparent caveat:

> "In discharging this oversight responsibility, however, courts cannot assume that state legislatures and prison officials are insensitive to the requirements of the Constitution or to the perplexing sociological problems of how best to achieve the goals of the penal function in the criminal justice system: to punish justly, to deter future crime, and to return imprisoned persons to society with an improved chance of being useful, law-abiding citizens." *Ibid.*

As I suggested at the outset, none of this has anything to

do with this case, because no one contends that the State had those goals in mind when it permitted SOCF to become overcrowded. This dictum, moreover, takes far too limited a view of the proper role of a federal court in an Eighth Amendment proceeding and, I add with some regret, far too sanguine a view of the motivations of state legislators and prison officials. Too often, state governments truly are "insensitive to the requirements of the Eighth Amendment," as is evidenced by the repeated need for federal intervention to protect the rights of inmates. See, *e. g., Hutto* v. *Finney,* 437 U. S. 678 (1978) (lengthy periods of punitive isolation); *Estelle* v. *Gamble,* 429 U. S. 97 (1976) (failure to treat inmate's medical needs); *Battle* v. *Anderson,* 564 F. 2d 388 (CA10 1977) (severe overcrowding); *Gates* v. *Collier,* 501 F. 2d 1291 (CA5 1974) (overcrowding and poor housing conditions); *Holt* v. *Sarver,* 442 F. 2d 304 (CA8 1971) (unsafe conditions and inmate abuse); *Pugh* v. *Locke,* 406 F. Supp. 318 (MD Ala. 1976) (constant fear of violence and physical harm), aff'd, 559 F. 2d 283 (CA5 1977), rev'd in part on other grounds, 438 U. S. 781 (1978) (*per curiam*). See also *ante,* at 353–361 (BRENNAN, J., concurring in judgment).[8]

---

[8] The majority's treatment of the expert evidence in this case also calls for some comment. The Court asserts that expert opinions as to what is desirable in a prison "may be helpful and relevant with respect to some questions" but " 'simply do not establish the constitutional minima; rather, they establish goals recommended by the organization in question.' " *Ante,* at 348, n. 13, quoting *Bell* v. *Wolfish,* 441 U. S., at 543–544, n. 27. That is more or less a truism, but it plainly does not advance analysis. No one would suggest that a study, no matter how competent, could ever establish a constitutional rule. But once the rule is established, it is surely the case that expert evidence can shed light on whether the rule is violated. Cf. *Brown* v. *Board of Education,* 347 U. S. 483, 494, n. 11 (1954) (using psychological studies to show harm from segregation). Thus even if it is true, as the majority asserts, that the Eighth Amendment forbids only a punishment that "either inflicts unnecessary or wanton pain or is grossly disproportionate to the severity of crimes warranting imprisonment," *ante,* at 348, surely a court faced with a claim of unconstitutionality would want to know whether anyone had in fact studied the

A society must punish those who transgress its rules. When the offense is severe, the punishment should be of proportionate severity. But the punishment must always be administered within the limitations set down by the Constitution. With the rising crime rates of recent years, there has been an alarming tendency toward a simplistic penological philosophy that if we lock the prison doors and throw away the keys, our streets will somehow be safe. In the current climate, it is unrealistic to expect legislators to care whether the prisons are overcrowded or harmful to inmate health. It is at that point—when conditions are deplorable and the political process offers no redress—that the federal courts are required by the Constitution to play a role. I believe that this vital duty was properly discharged by the District Court and the Court of Appeals in this case. The majority today takes a step toward abandoning that role altogether. I dissent.

---

effect of the punishment in issue. Deciding whether that effect was of unconstitutional proportions, and, indeed, whether the study was competently done, would naturally remain the court's function. Here, the trial court deemed the expert opinion presented to it worthy of considerable weight in its assessment of the conditions at SOCF. The majority, however, casts it aside without even a token evaluation of the methodology, content, or results of any of the studies on which the District Court relied. If expert opinion is of as little value as the majority implies, then even plaintiffs with meritorious claims that their conditions of confinement violate the Eighth Amendment will have tremendous difficulty in proving their cases.