[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The petitioner, Napier Talton, was first committed to the custody of the respondent in 1973 for manslaughter. While on parole for this offense he was convicted of sexual assault in the first degree. He was sentenced to a term of twenty-five years to life for that crime and for being a persistent dangerous felony offender on March 26, 1982 and re-entered Somers-CCI on that day.
On April 17, 1986 while in his cell, the petitioner suffered a cerebral aneurysm al bleed, commonly known as a stroke. He was removed to Hartford Hospital, underwent surgery, and returned to Somers-CCI on May 23, 1986. Although his petition is dated December 3, 1987, the record indicates that it was filed January 30, 1987. A revised amended petition dated February 5, 1990 is the subject of this action.
In the revised amended petition Napier Talton contends that he has suffered pain and has been denied adequate and appropriate medical care after his stroke; that he has been harassed because of his condition and because he filed another lawsuit against the respondent; that he was not treated properly prior to and after suffering his stroke; that he was leg shackled in the hospital causing him to become continent; and, that he has been subjected to indifferent medical care before and after the stroke and steps have not been taken to properly care for him. The petitioner also claims that he is defenseless when interacting with the general prison population because of his condition and the respondent has taken no special steps to protect him. The petitioner claims the action of the respondent referred to amount to conditions of confinement which constitute cruel and unusual confinement in violation of the Eighth Amendment of the U.S. Constitution, made applicable to the States through theFourteenth Amendment.
The respondent has denied these claims and alleges the petitioner, before and after his stroke, has received medical care that meets the constitutional requirements set forth in Estelle v. Gamble, 429 U.S. 97 (1976).
At the outset the court notes that the petitioner's claim of harassment found in paragraph 2c of his amended revised petition and his claim that he is defenseless when interacting with the general CT Page 1006 prison population found in paragraph 2d are not properly cognizable in this habeas corpus petition, whether or not the claims are true and whether or not the claims are related to the petitioner's medical condition. To come within the purview of a petition for a writ of habeas corpus, the only rights with which the court is concerned are those founded in the Constitution or thought to be of a substantial character. Ciarmelia v. Brownell, 35 Conn. Sup. 117, 118 (1978). A vague claim of harassment and a vague claim that the petitioner is defenseless when interacting with other prisoners, both allegedly caused by a claimed medical condition, do not rise to the level of rights contemplated by the test of Ciarmelia, id. Because the court has addressed the underlying circumstances surrounding these claims, the petitioner is not prejudiced by the court's decision not to review them directly.
The four remaining claims of the petitioner relate to allegations of improper and/or indifferent medical care before and after his stroke.
The Superior Court, in Dukuly v. Warden, 34 Conn. Sup. 88 (1977), a habeas action in which it was claimed that conditions of confinement constituted cruel and unusual punishment, concluded the writ of habeas corpus was available to remedy any kind of governmental restraint contrary to fundamental law. Sanchez v. Warden, 214 Conn. 23, 33
(1990) citing Dukuly, 34 Conn. Sup. 88. "If the nonjudgmental aspects of restraint lead to restraint that has unconstitutional qualities and properties, a question is raised as to the legality of the detention." Dukuly, 34 Conn. Sup. at 93.
The Eighth Amendment to the United States Constitution precludes the imposition of cruel and unusual punishment on an individual convicted of a crime. Cruel and unusual punishment encompasses more than barbarous physical punishment. Arey v. Warden, 187 Conn. 324, 328
(1982) citing Rhodes v. Chapman, 452 U.S. 337, 345 (1981). The test for determining whether a given set of conditions of confinement violates the Eighth amendment is not static. It is determined by the evolving standards of decency that mark the progress of a maturing society. Rhodes, 452 U.S. at 341. "But conditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional. To the extent that such conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society. Rhodes, 452 U.S. at 347.
The test or standard applied to the constitutional requirement for medical care is set forth in Estelle v. Gamble, 429 U.S. 97, 104
(1976): "We therefore conclude that deliberate indifference to serious medical needs of prisoners constitutes the `unnecessary and wanton infliction of pain'. . .proscribed by the eighth amendment." The Supreme Court emphasized that "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." Id. CT Page 1007 at 106. "In order to state a cognizant claim, a prisoner must allege acts of omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend `evolving standards of decency' in violation of theEighth Amendment." Id. at 106.
The petitioner has the burden of proof establishing the underlying facts, i.e., the conditions of his confinement [that constitute cruel and unusual punishment] by a fair preponderance of the evidence. Blue v. Robinson, 173 Conn. 360, 370 (1977).
At his hearing of April 18, 1990, the petitioner testified that he had a long history of hypertension and received medication to be taken on a daily basis. He said his weekly blood pressure checkups were not always done and that he did not always receive the right food from the diet mess line at Somers-CCI. His medical records indicate his blood pressure was relatively normal just two days before his stroke. Dr. McGuane, a Somers-CCI physician, testified that nothing in the petitioner's medical record indicated he was about to have a stroke, although the records indicate that the petitioner sometimes failed to appear at the prison medical facility for his weekly checkups.
After his stroke on April 17, 1986, he was immediately removed to Hartford Hospital where surgery was done by a well-known Hartford neurosurgeon, Dr. Collias. Because of his prisoner status he was fastened to his hospital bed by a handcuff and later by an ankle restraint. On one occasion he became incontinent before a staff nurse arrived to assist him. He was discharged on May 23, 1986.
Dr. McGuane testified that the petitioner, as the result of the stroke, suffered a vitreous hemorrhage of his left eye. Talton claimed in his testimony that the eye was not treated properly and was still not right. But Dr. Blanchette, the medical director at Somers-CCI, testified the petitioner was seen six times between 1986 and 1988 by ophthalmologists and optometrists. Acknowledging that at one point there was a thirteen month break between visits, Dr. Blanchette explained that often there will be a spontaneous resolution of the vision problems caused by the hemorrhage, i.e., the body will heal itself over a period of time, making an operation unnecessary. For this reason it was medically advisable to wait a reasonable time before referring the petitioner for possible surgery. A Dr. Packer performed a vitrectomy on January 13, 1989. As a result thereof the petitioner's eyesight has improved, but he still has a residual problem with his eye, a condition known as extropia, which is presently being treated by Dr. Packer, a retinologist.
When the petitioner was released from Hartford Hospital on May 23, 1986, it was noted that he required occupational therapy and physical therapy. Dr. McGuane testified there was perhaps a need for CT Page 1008 cognitive therapy, as well. A neurosurgical follow-up was held August 11, 1986 with Dr. Chagnon, a rehabilitative specialist who recommended a neurophysical evaluation, occupational therapy twice per week, along with speech therapy. A neurophysical evaluation was done by Dr. Chagnon on March 23, 1987, who again recommended occupational therapy. Occupational therapy began with Ms. Pat McLaughlin of the Enfield Visiting Nurse Association on May 14, 1987, nearly one year after the first recommendation was made. Two weeks later the therapist reported that the petitioner had met his short and long term goals. The petitioner says that Ms. McLaughlin worked only with his handwriting, that his right arm is bad and as a result [of the residual effects of the stroke] he can't write.
The sum and substance of the petitioner's reviewable claims are as follows:
(1) he did not receive a complete neurophysical examination as recommended by Dr. Chagnon after the examination August 11, 1986 at St. Francis Hospital in Hartford;
(2) he did not receive any speech or occupational therapy as was recommended by Dr. Chagnon on August 11, 1986, until May 14, 1987; and
(3) he experienced blurred vision, double vision and vision at an angle apart from the vision in the right eye, by reason of the delay between the date of the stroke, April 17, 1986, and the date of the vitrectomy, January 13, 1989. All of these claimed improprieties are subsequent to his stroke. Not a scintilla of evidence was introduced to establish any improper medical care prior to the stroke.
The petitioner must demonstrate, pursuant to Estelle, supra, that he has serious medical needs and (emphasis supplied) that the warden has been deliberately indifferent to those needs. A review of the petitioner's medical file indicates otherwise and the testimony of the Somers-CCI physicians also rebuts this claim. Moreover, he has been examined and treated outside the prison by several specialists in various medical fields. While he has not fully recovered from the effects of his stroke he has made remarkable improvement according to the testimony the court heard. He was scheduled to see Dr. Packer, the retinologist, in May to continue treatment for extropia. Otherwise he appears to have reached maximum improvement in the opinion of the Somers-CCI physicians, to whom he has ready access on a daily basis.
There were delays in scheduling a neurophysical evaluation, a vitrectomy, and some speech and occupational therapy sessions. This may have caused the petitioner to be apprehensive about the quality of care he was receiving but there was no evidence introduced that these delays affected his medical condition adversely. (The rationale for the delay in scheduling the vitrectomy was explained by Dr. Blanchette in terms of sound medical practice.) Nothing the court heard even CT Page 1009 suggests such deliberate indifference as must be shown to constitute cruel and unusual punishment in violation of the Eighth Amendment.
The petition is dismissed.
POTTER, J.