Dodge v. Dept. of Corrections      CV-97-260-M    03/12/99

UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Jonathan Dodge
(f/k/a Brian Smith), et al.,
    Plaintiffs

v.                                              Civil No. 97-260-M

Commissioner, New Hampshire
Department of Corrections, et al.,
    Defendants.


**O R D E R**

Jonathan Dodge (formerly Brian Smith) and a group of his fellow inmates at the New Hampshire State Prison filed this pro se civil action, pursuant to 42 U.S.C. § 1983, seeking declaratory and injunctive relief as well as monetary damages. Plaintiffs originally named as defendants, among others, Stephen Merrill (the former Governor of New Hampshire), the entire New Hampshire Superior Court bench, one Justice of the New Hampshire Supreme Court, and unnamed members of the New Hampshire Legislature. All claims against those defendants have been dismissed. Additionally, approximately 22 of the original 28 plaintiffs have voluntarily withdrawn.[1]

In their amended complaint, plaintiffs summarize their claims as follows:

---

[1] The remaining plaintiffs in this action are: Jonathan Dodge, John K. Bill, Ronald Schultz, Wallace Lowell, Christopher Donnelly, and David Short.

> [Plaintiffs], state prisoners, are suing for damages
> and injunctive relief under 42 U.S.C. § 1983, alleging
> prison overcrowding, lack of furnishings, lack of
> ventilation, inadequate heating, cooling, lighting,
> sanitation, selection for programming, recreation,
> food, medical and mental health treatment, and
> protection for protective custody inmates; excessive
> noise, inadequate and meaningful access to the courts,
> interference in preparing court cases, punishment and
> retaliation for court cases, refusal to use [N.H. Rev.
> Stat. Ann.] 651:20 to reduce the prison population,
> conspiracy between Stephen Merrill and Paul Brodeur
> [Commissioner of Corrections] so that RSA 651:25 would
> not be used to reduce the prison population, [and]
> outrageous parole requirements and steps to [prevent
> the] release [of] inmates after they have been paroled.

Amended complaint (document no. 6) at 2.  By prior order, the court dismissed plaintiffs' claims alleging that they were subjected to unconstitutional or otherwise unlawful parole requirements.  See Order dated December 3, 1997 (document no. 19).  The court also denied plaintiffs' motion to certify this proceeding as a class action.  Finally, the court denied plaintiffs' original petition for a temporary restraining order and preliminary injunction, as well as others that followed.  See Orders dated May 15, 1998 (document no. 88), October 15, 1998 (document no. 148).  See also Report and Recommendation of the Magistrate Judge dated February 1, 1999 (document no. 170, recommending the denial of Dodge's third motion for temporary restraining order, in which he seeks, among other things, an FBI investigation (including handwriting analysis) into whether he was properly disciplined for having forged a medical pass).

2

Pending before the court are Dodge's motion for partial summary judgment as to his claims for inadequate medical care (document no. 115) and defendants' objection and cross motion for partial summary judgment as to those medical claims (document no. 127). Defendants have also moved for summary judgment as to all of plaintiffs' Eighth Amendment claims, as well as their claims alleging that they have been denied meaningful access to the courts (document no. 155). In response, plaintiffs have submitted an objection/cross motion for summary judgment (document no. 175).

## Standard of Review

Summary judgment is appropriate when the record reveals "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When ruling upon a party's motion for summary judgment, the court must "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the

3

moving party carries its burden, the burden shifts to the nonmoving party to demonstrate, with regard to each issue on which it has the burden of proof, that a trier of fact could reasonably find in its favor. See DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir. 1997).

At this stage, the nonmoving party "may not rest upon mere allegation or denials of [the movant's] pleading, but must set forth specific facts showing that there is a genuine issue" of material fact as to each issue upon which he or she would bear the ultimate burden of proof at trial. Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)). In this context, "a fact is 'material' if it potentially affects the outcome of the suit and a dispute over it is 'genuine' if the parties' positions on the issue are supported by conflicting evidence." Intern'l Ass'n of Machinists and Aerospace Workers v. Winship Green Nursing Center, 103 F.3d 196, 199-200 (1st Cir. 1996) (citations omitted).

**Discussion**

I.  Dodge's Motion for Partial Summary Judgment - Denial of Appropriate Medical Care.

Dodge contends that defendants subjected him to cruel and unusual punishment in violation of the Eighth Amendment, made applicable to the states by the Fourteenth Amendment, when prison officials acted with deliberate indifference to his serious medical (i.e., visual) needs.

4

A.   Governing Standard.

In order to prove a claim for medical mistreatment under the Eighth Amendment, an inmate must show that prison officials demonstrated "deliberate indifference to [his] serious medical needs." Estelle v. Gamble, 429 U.S. 97, 106 (1976). This test has both subjective (state-of-mind) and objective components. See DesRosiers v. Moran, 949 F.2d 15, 18 (1st Cir. 1991).

In a 1994 opinion, Justice Souter explained the state-of-mind element of deliberate indifference in the context of an Eighth Amendment claim. See Farmer v. Brennan, 511 U.S. 825, 834-847 (1994). A prison official is liable "only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." Id., at 847. Accordingly, an Eighth Amendment medical mistreatment claim cannot be premised upon a theory of simple negligence or medical malpractice. A physician's conduct must go beyond negligence in diagnosing or treating a prisoner's medical condition. Similarly, an Eighth Amendment violation does not occur merely because a prisoner happens to disagree with a physician's decision regarding the proper course of medical treatment. See Watson v. Caton, 984 F.2d 537, 540 (1st Cir. 1993) ("The courts have consistently refused to create constitutional claims out of disagreements between prisoners and doctors about the proper course of a prisoner's medical

treatment, or to conclude that simple medical malpractice rises to the level of cruel and unusual punishment.").

With regard to the objective component of the deliberate indifference test, the prisoner must show that he or she has suffered a serious deprivation of a fundamental right or basic human need.  See DesRosiers, 949 F.2d at 18.  As the Supreme Court has observed, the Constitution "does not mandate comfortable prisons, and only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." Wilson v. Seiter, 501 U.S. 294, 298 (1991) (citation and internal quotation marks omitted).  See also Rhodes v. Chapman, 452 U.S. 337, 347 (1981) ("Conditions must not involve the wanton and unnecessary infliction of pain, nor may they be grossly disproportionate to the severity of the crime warranting imprisonment. . . . But, conditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional.  To the extent that such conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society.").

B.    Dodge's Allegations and the Medical Record.

In support of his claim that he was denied appropriate medical care, Dodge alleges the following:

6

> [P]laintiff has suffered since September 18, 1995 until
> February 24, 1997 with no medical treatment for his
> eyes. Then[,] in addition to that[,] the plaintiff was
> not given his new glasses until at least May 1, 1997.
> The plaintiff suffered from November 10, 1996 until at
> least May 1, 1997 without his prescription glasses[,]
> [d]espite the fact that Dr. Gordon had ordered the
> defendants to provide medical care two (2) years PRN.

Plaintiff's motion for partial summary judgment (document no. 115) at 1-2.

Pertinent medical records reveal that Dodge obtained a routine eye examination on November 22, 1994, performed by Dr. Hogan. Medical records of Brian Smith (now, Jonathan Dodge) at 79. At the time, Dodge complained of a "floater" in his left eye and had a slight visual impairment, with uncorrected vision of 20/30 for both eyes. Based upon his examination of Dodge, Dr. Hogan recommended corrective lenses as optional and suggested that Dodge undergo a dilated eye examination for evaluation of the floater. Medical records at 79.

Less than two months later, Dr. Michael Gordon performed the dilated eye examination in order to evaluate Dodge's complaints regarding the floater in his left eye. Medical records at 78. Dr. Gordon observed no abnormality in either of Dodge's eyes and recommended that he be seen again in two years. Approximately two years later, on February 24, 1997, Dodge was seen by Dr. Randy Williams. Medical records at 77. In his affidavit, Dr. Williams testified that Dodge requested new glasses, but did not

7

report any problems with his eyes. Williams affidavit at para. 6. Dr. Williams reported that as of February, 1997, Dodge's "visual impairment remained slight and his uncorrected vision was 20/40 for both eyes. Other than a sensitivity to bright light, Mr. Dodge's exam was unremarkable. I prescribed new eyeglasses and recommended a tint or photogrey to help with bright lights. I recommended that he be seen again in two years [i.e., in approximately February of 1999]." Id.

During the two year period between his eye examinations in 1995 and 1997 (the period during which he claims defendants were deliberately indifferent to his serious medical needs), plaintiff requested additional eye examinations, which were denied. He was specifically advised that: (a) the treating doctors did not believe that he needed more frequent eye examinations; (b) if he chose, he could elect to obtain additional examinations at his own expense; and (c) if he was experiencing any physical discomfort, he should report to medical call. During that period, Dodge was seen by a nurse or doctor nearly 30 times for various medical/visual complaints. Medical records at 38-50.

At least three doctors have examined Dodge's eyes and professionally evaluated his complaints regarding his vision. None has concluded that Dodge suffers from anything other than garden variety and minor nearsightedness. Dr. Williams, one of

8

the doctors who personally examined Dodge and reviewed his medical records, offered the following opinions.

> Mr. Dodge's eyes are healthy and his level of vision and ocular health do not require special attention or annual evaluation.  Mr. Dodge can read and otherwise function without glasses.  As a point of reference, Mr. Dodge's uncorrected eyesight is sufficient to pass the New Hampshire Motor Vehicle eye test, which requires 20/40 vision to drive without glasses.  Individuals with 20/40 vision routinely go without glasses.
>
> In my medical opinion, Mr. Dodge has no serious medical need and his need for glasses is minimal.  Mr. Dodge's vision would not have deteriorated and he would not have suffered physical distress if he continued with his prior 1994 prescription.  Even assuming Mr. Dodge was completely without glasses from November 1996 to May 1997, his vision would not have worsened and he would not have suffered physical distress.

Williams affidavit at paras. 7-8.

Having carefully reviewed the arguments and submissions of the parties, the court concludes that Dodge has failed to establish his entitlement to judgment as a matter of law.  On the contrary, the record demonstrates beyond reasonable contradiction that his visual impairment is, at most, minor and does not constitute a "serious medical need."  Thus, even if he could demonstrate that defendants were "deliberately indifferent" to that need (which he has not), he still could not prevail on his Eighth Amendment claims as they relate to his visual problems.

The record shows that defendants did not deny Dodge any of the "minimal civilized measure[s] of life's necessities," Wilson

9

v. Seiter, 501 U.S. at 298, nor was their conduct "an unnecessary and wanton infliction of pain" or otherwise "repugnant to the conscience of mankind." Estelle, 492 U.S. at 105-106. Accordingly, defendants are entitled to judgment as a matter of law as to Dodge's medical mistreatment claims under the Eighth Amendment.

II.    Defendants' Motion for Summary Judgment as to all of
       Plaintiffs' Eighth Amendment Claims.

Defendants also move for summary judgment as to all of plaintiffs' Eighth Amendment claims. None of the plaintiffs (including Jonathan Dodge) filed a timely objection.[2]

---

[2]    Defendants filed their motion for summary judgment (document no. 155) on October 30, 1998. Plaintiffs' response was due on or before December 2, 1998. In lieu of an objection, Dodge filed a motion seeking an extension until February 5, 1999 to respond. In support of that request, Dodge generally alleged that he was "in the process of trying to get [defendants] in compliance with discovery requests from the plaintiff." Defendants vigorously denied that they had failed to produce any requested discoverable materials.

Dodge failed to file his response by February 5, 1999. Nevertheless, the court, acting sua sponte, granted him an additional extension, this time until February 26, 1999. In so doing, the court specifically instructed Dodge to "respond to the pending motion for summary judgment in sufficient time to arrive in the clerk's office no later than close of business on February 26, 1999. No further extensions will be granted absent extraordinary circumstances. Plaintiff will not be heard to invoke routine administrative excuses for further delays." Once again, despite ample opportunity to do so, Dodge failed to file any papers in opposition to defendants' motion for summary judgment in a timely manner. His "cross-motion for summary judgment and answer to defendants' motion for summary judgment" (document no. 175) was not filed until March 2, 1999. Notwithstanding its untimely filing, the court has considered that motion/objection and each of the exhibits submitted along with it, given his pro se status and, frankly, to avoid further pleadings and litigation regarding plaintiff's failure to comply.

10

In their amended complaint, plaintiffs allege that defendants violated their Eighth Amendment right to be free from cruel and unusual punishment by causing them to be confined in an overcrowded prison and by permitting conditions within the prison to deteriorate to the point that there are serious health and safety risks to the inmate population.  They challenge virtually every imaginable aspect of their confinement within the prison.  Specifically, plaintiffs allege that their Eighth Amendment rights have been violated by the following conditions:

1.    inadequate ventilation, heating, and cooling;
2.    excessive noise;
3.    inadequate lighting;
4.    overcrowded living space;
5.    inadequate furnishings;
6.    inadequate recreational opportunities and educational programming;
7.    inadequate protection provided to protective custody inmates from dangerous inmates;
8.    inadequate food;
9.    unsanitary conditions; and
10.   inadequate medical care.

See generally Amended complaint at paras. 175-186; 190; 192-94.


A.    Governing Standard.

In order to prevail, plaintiffs must demonstrate that the conditions within the prison constitute "cruel and unusual punishment" within the meaning of the Eighth Amendment.  As with Mr. Dodge's medical claims, plaintiffs must show that defendants acted with deliberate indifference to their legitimate needs.

11

See generally Wilson v. Seiter, 501 U.S. at 303 ("Whether one characterizes the treatment received by [the prisoner] as inhumane conditions of confinement, failure to attend to his medical needs, or a combination of both, it is appropriate to apply the 'deliberate indifference' standard articulated in Estelle.") (citation omitted). Absent proof that defendants acted with the requisite state of mind, plaintiffs' Eighth Amendment claims regarding the conditions of their confinement necessarily fail.

> After incarceration, only the unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment. To be cruel and unusual punishment, conduct that does not purport to be punishment at all must involve more than ordinary lack of due care for the prisoner's interests or safety . . . . It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock.

Whitley v. Albers, 475 U.S. 312, 319 (1986).

So, for example, "if a prison boiler malfunctions accidentally during a cold winter, an inmate would have no basis for an Eighth Amendment claim, even if he suffers objectively significant harm." Wilson v. Seiter, 501 U.S. at 300. In short, "[i]f the pain inflicted is not formally meted out as punishment by the statute or the sentencing judge, some mental element must be attributed to the inflicting officer before it can qualify" as

12

violative of the Eighth Amendment.  Id.  Nevertheless, the prisoner need not show that the defendant acted (or failed to act) with the intention that substantial injury would actually result; "it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." Farmer v. Brennan, 511 U.S. at 842.

As to the requirement that plaintiffs establish that defendants deprived them of a serious or fundamental need, plaintiffs must demonstrate that, whether viewed individually or in combination, the alleged conditions at the prison produced a deprivation of one or more basic "identifiable human need[s] such as food, warmth, or exercise." Wilson v. Seiter, 501 U.S. at 304.

B.    Defendants' Motion for Summary Judgment.

Notwithstanding plaintiffs' unsupported and conclusory allegations to the contrary, the record demonstrates that plaintiffs have not been subjected to unconstitutional living conditions at the prison; there is simply no evidence that the conditions within the prison to which plaintiffs were subjected, whether viewed alone or in combination, rise to the level of cruel and unusual punishment under the Eighth Amendment.  Nor have plaintiffs pointed to any evidence which even suggests that defendants were deliberately indifferent to their legitimate health, safety, or welfare needs.

13

Among other things, the plaintiffs' own deposition testimony, the affidavits submitted by defendants, and the other exhibits attached to defendants' motion for summary judgment demonstrate that:

- During the time relevant to this suit, plaintiffs were protective custody inmates, housed in the prison's E Pod.

- E Pod contains, among other things, eight tables with attached seating, a weight machine, punching bag, and recreational ping-pong, pool, and fooseball tables.

- Each plaintiff shared a cell with other inmates, but was provided with his own bunk. Each cell contains four desks, chairs, and a working overhead light.

- Each plaintiff was permitted to open the window in his cell, keep the door to his cell open, and move freely about the E Pod from 5 a.m. to 10 p.m. Additionally, plaintiffs were permitted to operate fans.

- Each plaintiff received two blankets, a coat, two or three sets of thermal underwear, leather boots, hats, and gloves.

- As protective custody inmates (a status assigned to them for their own protection), plaintiffs were permitted one hour of "yard time" each day. They were also permitted access to the North Yard and gymnasium for one and one-half hours three days a week and to the weight room for two and one-half hours three days a week.

- The restroom facilities in E Pod are operational and cleaned twice daily. If they need additional cleaning, an inmate may request the necessary supplies.

- The menu served by the prison dining hall provides adequate nutrition for inmates to maintain good health and meets the established recommended daily allowances for nutrients.

14

- The prison provides an adult vocational training center, where inmates receive training in areas such as small engine repair, accounting, auto mechanics, autobody repair, and food service management. Prisoners are also offered rehabilitative programs such as a substance abuse recovery program, a sexual offender program, and other programs designed to develop personal responsibility and avoid anti-social behavior.

- At their depositions, plaintiffs testified that they have not been subjected to violence and have generally felt safe since being placed in protective custody.

- Several plaintiffs also testified that they have suffered no adverse health effects as a result of the conditions at the prison.

- The prison is in compliance with the New Hampshire Division of Public Health Services standards concerning noise, lighting, air quality, and temperature.

See generally Exhibits attached to defendants' motion for summary judgment.

Plaintiffs acknowledge that their deposition testimony substantially undermines their Eighth Amendment claims. However, they attempt to downplay that testimony by explaining that they were misled into giving answers that were inaccurate, unintended, or otherwise unrepresentative of their true plight. So, for example, plaintiff John Bill explains:

> Our testimony at the deposition [did] refute some of our claims, but that is only due to the clever questioning and leading questions, that could only arrive at one answer and that's to the benefit of the State.

15

Affidavit of John Bill, at para. 5 (attached to document no. 177). Dodge explains the contradictory deposition testimony in a different way — asserting that when responding to questions about the allegedly unconstitutional conditions within the prison and how they had adversely affected him, he was only addressing how they were affecting him at that very moment, as he was being deposed, and not in the broader context of how those conditions affected him on a daily basis:

> The way the plaintiffs understood [the Assistant Attorney General's] pre-deposition rules, was that [she] wanted answers to her questions based upon what was happening on that date and not rights violations to other inmates. The fact is under these circumstances the plaintiffs told the truth, which the defendants are now trying to mislead the court with.
>
> Constitutional rights violations do not happen every minute of every day, for example while the plaintiff[s] were in the hearing room at the New Hampshire State Prison [being deposed], overcrowding did not affect them at all.

Dodge's cross-motion for summary judgment (document no. 175), at 4 (emphasis supplied). Plaintiffs' explanations for their deposition testimony, while imaginative, are not persuasive.

Curiously, plaintiffs have provided materials which, rather than advance their constitutional claims, actually lend support to defendants' motion for summary judgment. For example, in support of their objection/motion for summary judgment (document no. 175), plaintiffs submitted an undated portion of a letter from Senior Circuit Judge Bownes (presumably addressed to the

16

Warden of the New Hampshire State Prison and presumably submitted in support of plaintiffs' claim that double bunking inmates is unconstitutional). In it, Judge Bownes comments upon a tour that he had recently taken of the prison and its facilities:

> One of the things that distressed me in my 1977 tour of the prison was the unsanitary and filthy conditions that prevailed throughout. This is in sharp contrast to the clean, bright, spick-and-span condition in which you and your staff have kept the present prison.
>
> I was impressed by the medical facilities and the medical care that is guaranteed the prisoners by virtue of the fact that you have a full-time doctor and a complement of nurses on duty at all times. The dental facilities and dental care available are also impressive.
>
> From what I saw today I think I am justified in concluding that the New Hampshire State Prison is one of the finest institutions of its size in the country.
>
> It is evident that you have surrounded yourself, not only with an outstanding staff, but one that believes that prisoners should be treated as human beings and given an opportunity to return to society better prepared mentally and physically to meet its challenges than when they were committed to prison.
>
> The only reservation I have about the prison is the double-bunking of inmates. I know that this is a necessity at the present time, but I am hopeful that the prison will be able to return to the single-cell institution as originally planned.
>
> I salute you and your staff on doing an outstanding job in a very difficult and demanding field. It is reassuring to know that in New Hampshire, at least, prison inmates are encouraged and given the opportunity to overcome their mental and emotional problems and obtain education and training that will help them become useful members of society.

Exhibit B to plaintiffs' memorandum in support of summary judgment.

Materials submitted by defendants demonstrate that Judge Bownes is not the only person who has been impressed by the prison facilities, staff, and programming. In 1995, the American Correctional Association (the "ACA") conducted a three-year accreditation inspection of the prison. In November of that year, the ACA issued its report, in which it observed, among other things, that:

> During the tour, the team evaluated the conditions of confinement at the facility and found the overall quality of life to be excellent. The facility is clean, clean, clean – possibly one of the cleanest institutions the three team members have ever visited. Even though most all of the housing units are over capacity, this does not give the appearance or feeling of overcrowdedness. The staff and population are handling this quite well. Work and programming for the population allow for some idleness, but not excessively. The population felt little concern regarding physical violence and this was supported by records indicating that during the past few years, even with population increases, assaults have steadily declined. The staff appeared to be well-trained, aware of the job requirements, knowledgeable of post orders, courteous, and quite professional. There is an excellent mix of seasoned and new correctional staff. The population was well aware of the audit and its purpose and generally supportive of the administration and its efforts. The programs available in work, education and industries are constantly full and have waiting lists. Positive comments were received regarding most all areas. The informal communication system between staff and inmates appears to be excellent, allowing inmates' small problems to be attended to before they become large problems. This facility appears to operate quite well providing for an excellent correctional institutional tone.

Visiting Committee Report of the ACA, at 3. In October of 1998, the ACA conducted another three-year accreditation inspection and review of the prison. The preliminary results of that inspection

18

reveal that the prison is, once again, in compliance with all of the mandatory accreditation standards and 98.8 percent of the non-mandatory standards (of 432 applicable non-mandatory standards, the ACA concluded that the prison failed to comply with only 5). ACA mandatory standards address issues such as food service facilities, appropriate food service inspection, sanitation inspection, vermin/pest control, and adult programming.

More to the point, perhaps, plaintiffs' submissions contain no evidence which even suggests that there is a genuine issue of material fact with regard to the following questions: (1) whether the conditions within the prison operated to deprive plaintiffs of one or more basic human necessities; or (2) whether defendants acted with deliberate indifference to those necessities. In fact, the summary judgment record demonstrates that plaintiffs have suffered no deprivation of any right which might support a claim that they have been subjected to cruel and unusual punishment in violation of the Eighth Amendment. The mere fact that plaintiffs may, at times, be uncomfortable or unhappy with their confinement status or its concomitant restrictions and deprivations does not, standing alone, make out an Eighth Amendment claim. See, e.g., Hudson v. McMillian, 503 U.S. 1, 9 (1992) ("extreme deprivations are required to make out a conditions-of-confinement claim."). See also Woods v. Edwards, 51 F.3d 577, 581 (5th Cir. 1995); Strickler v. Waters, 989 F.2d

19

1375, 1381-82 (4th Cir. 1993). Similarly, the fact that the prison is housing more inmates than it was originally designed to accommodate is, without more, an insufficient basis upon which to grant plaintiffs the relief they seek. See, e.g., Rhodes v. Chapman, 452 U.S. 337, 348-49 (1981).

Other than unsupported conclusory allegations in their pleadings and affidavits, plaintiffs have produced nothing which undermines defendants' supported claim that they are entitled to judgment as a matter of law. In fact, much of what plaintiffs have submitted supports defendants' position. Defendants, on the other hand, have established that there is no genuine issue as to any material fact and that they are entitled to judgment as a matter of law with regard to all of plaintiffs' Eighth Amendment claims.

III. Defendants' Motion for Summary Judgment as to Plaintiffs' Claims that They were Denied Meaningful Access to the Courts.

Plaintiffs assert that because they have been denied meaningful access to the prison's law library: (1) they were forced to delay the filing of this lawsuit by three years; and (2) were unable to file a timely objection to a motion for summary judgment in another suit filed in this court. As to the latter claim, the record demonstrates that defendants are entitled to judgment as a matter of law. First, the prior suit involved only Dodge; none of the other remaining plaintiffs in

20

this action was involved in that prior litigation. Second, summary judgment was granted against Dodge in the prior litigation, not because he was unable to file a proper response due to inadequate access to the law library, but because he "fail[ed] to support his claim that the defendants acted with deliberate indifference" by failing to protect him from a fellow inmate. Smith v. Grafton County Correctional Facility, No. 95-35-B, slip op. at 3 (D.N.H. December 5, 1996. That is to say, the court granted defendants' motion for summary judgment because Dodge failed to substantiate his factual claims, not as a result of any failure on his part to provide legal support for those claims. Thus, it is difficult to imagine how Dodge was prejudiced in that prior litigation by his alleged inadequate access to the law library.

With regard to plaintiffs' claim that the filing of this action was delayed by three years due to their inability to have meaningful access to the law library, the undisputed facts in the summary judgment record demonstrate that defendants are entitled to judgment as a matter of law. For example, at his deposition, Dodge acknowledged that when first placed in the E Pod, he was permitted to use the law library for at least an hour a day, four days a week. Dodge deposition at 47. Subsequently, protective custody inmates (like Dodge) were restricted to two hours in the library per week. Id. That time could, however, be extended for an additional two hours. Id., at 48. If the inmate needed even

21

more time in the law library (because of pending appeals or approaching court deadlines) he could request an additional five hours per week in the law library (for a total of up to nine hours per week).  Id.

To avoid summary judgment, Dodge and his fellow plaintiffs must do more than simply assert that, in their judgment, they have been provided insufficient time in the prison's law library. Instead, they must demonstrate that they suffered some suffered some quantifiable harm as a result of that alleged deprivation.

> Because [Bounds v. Smith, 430 U.S. 817 (1977)] did not create an abstract, free-standing right to a law library or legal assistance, an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is sub-par in some theoretical sense.  That would be the precise analogue of the healthy inmate claiming constitutional violation because of the inadequacy of the prison infirmary.  Insofar as the right vindicated by Bounds is concerned, "meaningful access to the courts is the touchstone," Bounds, 430 U.S. at 823, and the inmate therefore must go one step further and demonstrate that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim.  He might show, for example, that a complaint he prepared was dismissed for failure to satisfy some technical requirement which, because of deficiencies in the prison's legal assistance facilities, he could not have known.  Or that he had suffered arguably actionable harm that he wished to bring before the courts, but was so stymied by inadequacies of the law library that he was unable even to file a complaint.

Lewis v. Casey, 518 U.S. 343, 351 (1996).  Accordingly, "a prisoner contending that his right of access to the courts was violated because of inadequate access to a law library must

22

establish two things: First he must show that the access was so limited as to be unreasonable. Second, he must show that the inadequate access caused him actual injury." <u>Vandelft v. Moses</u>, 31 F.3d 794, 797 (9th Cir. 1994).

In response to defendants' motion for summary judgment, plaintiffs have failed to show that their access to the prison's library was so restricted as to be constitutionally deficient. To the contrary, the summary judgment record overwhelming supports the conclusion that plaintiffs' access to legal materials was, at a minimum, constitutionally sufficient. <u>See, e.g.</u>, <u>Lindquist v. Idaho State Bd. of Corrections</u>, 776 F.2d 851, 856 (9th Cir. 1985) ("the Constitution does not guarantee a prisoner unlimited access to a law library. Prison officials of necessity must regulate the time, manner, and place in which library facilities are used."). As the Court of Appeals for the First Circuit has observed:

> [I]n cases involving "ancillary features," such as library schedules, . . . the deprivation may affect merely comfort or convenience without depriving a prisoner of access to the courts. A court cannot make the assumption that any alleged administrative deficiency or less than optimal clerical arrangement actually impedes a prisoner's ability to file meaningful legal papers.
>
> * * *
>
> An absolute denial of access to all legal materials, like an absolute denial of access to a law library or other basic form of legal assistance, might be deemed inherently prejudicial, but this case does not involve such an unqualified deprivation. On the other hand, it would be unrealistic to expect prison authorities to

23

> give all prisoners unfettered access to [the law
> library or] all of their legal materials at all times.
> It is a fact of life that prisoners live in prison
> cells.

Sowell v. Vose, 941 F.2d 32, 34-35 (1st Cir. 1991).

Moreover, even if plaintiffs were able to show that, in the abstract, they received insufficient access to the prison's law library, defendants would still be entitled to judgment as a matter of law because plaintiffs have failed to point to any "actual injury" stemming from that alleged deprivation. See Lewis v. Casey, 518 U.S. at 351-52.

The law on this point is clear. Absent an "absolute denial" of access to the law library, plaintiffs must demonstrate, at a minimum, that the restrictions placed on their access to the library were sufficiently sever to cause them to suffer some actual harm. They have, however, failed to do so. As noted above, with regard to the case previously filed in this court, Dodge has failed to demonstrate any actual injury stemming from his claimed inability to have adequate access to the prison's law library. And, with regard to the instant proceeding, plaintiffs have failed to demonstrate: (1) how or why alleged inadequate access to the law library caused the claimed three year delay in filing this suit; or, perhaps more importantly, (2) how they suffered any "actual injury" as a result of that delay. Surely,

24

when the Supreme Court held that a prisoner alleging inadequate access to legal facilities must demonstrate an "actual injury," it did not have in mind a delay in filing a civil suit in which the court held that the claims raised were unsubstantiated and without merit and granted defendants' motion for judgment as a matter of law.

## Conclusion

In the span of roughly three years, between 1994 and 1997, Mr. Dodge (f/k/a/ Brian Smith) has filed six civil rights actions pursuant to 42 U.S.C. § 1983 in this court. The present proceeding has been characterized by Dodge's frequent pursuit of tangential and, at times, frivolous issues. See, e.g., document no. 50 (motion to require defendants to post a bond); document no. 66 (ex parte motion asking the court to involve the FBI in investigating alleged improprieties in the prison mail room), document no. 75 (motion for court ordered meeting); document no. 110 (motion to enter defendants' behavior into evidence). Dodge has also filed several motions seeking sanctions against defendants and/or their counsel. In ruling upon the three most recent motions for sanctions, the Magistrate Judge held that, contrary to Dodge's assertions, there was "no basis to conclude that [the Assistant Attorney General] lied. As to the second motion for sanctions the plaintiff misstates both affidavits [which he challenges as false]. The third motion is unsupported

25

and frivolous.  There is no basis for sanctions."  Order of the Magistrate Judge dated February 1, 1999 (document no. 169).

While the court understands that Mr. Dodge and the other plaintiffs are frustrated by what they perceive as unfair and unconstitutional practices by the State, both the tone of their pleadings and the language used in those papers are inappropriate, even for untrained pro se prisoners.  <u>See, e.g.</u>, Affidavit of Jonathan Dodge (exhibit to document no. 177), at para. 40 ("The plaintiff is pissed off at [the Assistant Attorney General], and he will never forget the stunt she pulled on him. The next time she needs additional time, she can go to hell and that means anyone else from the attorney general's office as well, on the 33rd day no matter what, I am filing a motion to compel discovery and they can cry their bullshit to the court."). This order is fair warning — future similar lapses will be sanctioned by striking the pleadings and imposition of such other sanctions as prove necessary to assure the appropriate conduct of litigation in this court.

As to the substantive issues raised in the complaint, Dodge has provided no support for his claims that he and fellow inmates have been subjected to conditions within the prison which violate the Eighth Amendment.  The same is true with regard to their claims of inadequate access to the law library and Dodge's repeated assertions that he is the victim of several far-reaching

26

conspiracies directed at, among other things, intercepting his mail, withholding critical evidence, stealing his legal papers, and subjecting him to discipline for conduct in which he did not engage.

It is past time to bring what now appears to be mildly harassing litigation on Dodge's part to a close. In the future, it may be necessary to take steps to insure that the limited resources available to both this court and the State of New Hampshire are not inappropriately and unnecessarily diverted by Dodge's penchant for unsupported and unsupportable litigation. See, e.g., Washington v. Alaimo, 934 F.Supp. 1395, 1400-01 (S.D. Ga. 1996) ("This Court is quite sure that, if the villagers who heard the boy cry 'wolf' one time too many had some form of reassurance that the boy's last cry was sincere, they would have responded appropriately and he would be alive instead of being dinner for the ravenous canine. . . . This Court will not turn a deaf ear to Plaintiff's future cries. However, it will require Plaintiff to structure his pleas for help in a more sincere manner so that the energies of the villagers are not wasted on the repeated runs up the grassy hill atop which the mischievous boy sits laughing.").

For the foregoing reasons and for the reasons set forth in defendants' memoranda in support of their motions for summary judgment, Jonathan Dodge's motion for partial summary judgment

27

(document no. 115) and his cross-motion for summary judgment (document no. 175) are denied. Defendants' motion for partial summary judgment as to Dodge's medical claims (document no. 127) and their motion for summary judgment as to all of plaintiffs' Eighth Amendment claims as well as plaintiffs' claims concerning inadequate access to the prison library (document no. 155) are granted. Plaintiffs' remaining motions (documents no. 139-1, 139-2, and 174) are denied as moot. Defendants' motion to strike (document no. 180) is likewise denied as moot.

The Clerk of the Court is instructed to enter judgment in accordance with the terms of this order and close the case.

**SO ORDERED**

_____
Steven J. McAuliffe
United States District Judge

March 12, 1999

cc:  John Bill
     Ronald Schultz
     Wallace Lowell
     Christopher Donnelly
     Jonathon H. Dodge
     David Short
     Jennifer B. Gavilondo, Esq.

28