**Bobby Wayne ARMSTRONG, et al.**

v.

**THE METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, Davidson County Sheriff's Department, et al.**

Nos. 3:87–0262, 3:87–0257.

United States District Court, M.D. Tennessee, Nashville Division.

March 11, 2002.

Susan Laurie Kay, Vanderbilt University Law School, Nashville, TN, for Bobby Wayne Armstrong, Timothy Wade Black, Tessie Majors, William D. Reese, Andrew Pratt, Michael Garlock, David Emile Lemire, Anthony Wilson, Richard C. Bowman, Howard Jackson, Richard Adams, David Steelman, Kenneth M. Pickle, Gilbert Everett.

Burney R. Davidson, Clifton, TN, pro se.

James Lawrence Charles, Kimberly M. Frayn, Rita M. Roberts–Turner, Metropol-

itan Legal Department, Nashville, TN, John Lee Kennedy, Metropolitan Legal Department, Nashville, TN, for Sheriff's Department, Davidson County, (Department of), Fate Thomas, Metropolitan Government of Nashville.

## MEMORANDUM

HIGGINS, District Judge.

This action was commenced in March 1987 when several inmates and pre-trial detainees of the Metropolitan Government's jails filed suit, alleging that the conditions of their confinement violated their rights under the Eighth and Fourteenth Amendments to the United States Constitution. The matter was subsequently certified as a class action lawsuit, on behalf of every individual who was or would become an inmate of the Metropolitan Government's jails. The history of this case since its inception has been long and arduous. In point of fact, at the time of this Court's intervention, the administration of the Metropolitan Government's jails was in the hands of a brutal and corrupt regime. The history is adequately summarized in the Parties' Joint Proposed Findings of Fact, which are adopted by the Court in their entirety as follows:

1. On April 3, 1989, former United States Magistrate Judge Haynes,[1] after an evidentiary hearing that included a tour of the Metropolitan Government's Criminal Justice Center Jail, Workhouse and Hill Building Jail, found that the Plaintiffs had established a substantial likelihood of success on the merits of their constitutional claims that the conditions of confinement in the Metropolitan Government jails violate the Plaintiff's rights under the Eighth and Fourteenth Amendments to the United States Constitution.[2] Judge Haynes recommended that this Court grant the Plaintiffs a preliminary injunction in the form of population limitations on the number of prisoners who can be confined in each of the Metropolitan Government's jails and further recommended injunctive relief to address the lack of sanitation, the lack of personal security and the lack of fire safety in the jails.

2. Although the Metropolitan Government initially filed objections to the Report and Recommendations, on October 20, 1989, the Metropolitan Government admitted before this Court that its jails were unconstitutional. On December 13, 1989, an Agreed Order was entered by the Court bifurcating the litigation through the *Dalton Roberts v. Tennessee Department of Correction*, 887 F.2d 1281 (6th Cir.1989) process. Unconstitutional jail conditions that were solely the responsibil-

---

1. Judge Haynes has since been appointed as a United States District Judge for the Middle District of Tennessee.

2. Specifically, the Magistrate Judge found that floor space for jail inmates was, in some locations, as little as seventeen or eighteen square feet per inmate, with the inmates being confined to their cells for twenty-two to twenty-three hours a day. Some inmates had no access to indoor recreation because the day rooms and gymnasium were being used for housing, and no outdoor recreation was available in inclement weather because of the lack of appropriate clothing. In some locations even dining rooms and offices were being used for housing. The Magistrate Judge

found that this excessive overcrowding resulted in intolerable noise and tension for the inmates, and inadequate personal security. He further determined that the overcrowding, in conjunction with lack of proper maintenance, resulted in inadequate ventilation and unsanitary conditions, including unsanitary food preparation and service. There was evidence of resulting increased risks to health associated with these conditions. The Magistrate Judge further found that structural design flaws at both the Workhouse and the Hill Center posed fire hazards, and that fire safety planning was absent or inadequate in all facilities. (See Report and Recommendation entered March 21, 1989, pp. 14–38; Docket Entry No. 149).

ity of the Metropolitan Government to correct were addressed through the original *Armstrong* litigation and a Remedial Plan. Population issues were addressed through the *Roberts* process. Mr. Allen Breed was appointed as the Special Master for correcting the unconstitutional conditions within the jails and he was also appointed as the Consultant for Local Corrections to address the population issues.

3. On July 25, 1990, the Court, upon the recommendation of the Consultant for Local Corrections, ordered population caps for the Metropolitan Government's detention facilities and set a timetable for the Tennessee Department of Correction to remove its convicted felons from the Metropolitan Government's facilities. (*Order,* Docket No. 81)

4. On April 30, 1991 the Court adopted and approved the Remedial Plan that addressed the constitutional violations in the Metropolitan jails that existed in the areas of personal safety, classification, recreation, programming, sanitation, fire safety and access to the courts. (Docket No. 247)

5. On June 3, 1993 the parties submitted *Joint Proposed Findings of Fact* to the Special Master in accordance with this Court's Order of April 12, 1993. In the *Joint Findings of Fact* the parties agreed that the Metropolitan jails were no longer unconstitutional and had met the requirements of the Remedial Plan. [Appendix A, *Special Master's Fourth Progress Report Concerning Defendants' Compliance With the Remedial Plan* (Docket No. 336) ]

6. On November 17, 1993, the *Special Master's Fourth Progress Report Concerning Defendants' Compliance with the Remedial Plan* (Docket No. 336) confirmed that the Metropolitan Government had corrected all unconstitutional conditions in its jails.

7. On December 3, 1993, both Defendants' counsel, Plaintiffs' counsel and the Special Master stated in response to the Court's questioning during the Status Hearing that the Metropolitan Government's detention facilities were now being operated in a constitutional manner.

8. On May 18, 1995, the parties agreed that the litigation should end if the Metropolitan Government could demonstrate its ability to control overcrowding in its jails. (*Order,* Docket No. 361). The Metropolitan Government was to notify plaintiffs' counsel and the Court when it had:

a. Developed a data processing jail information system that integrates the necessary criminal court records with police arrest records and is capable of objectively ranking inmates in order that scarce jail space may be allocated accordingly;

b. Amended its existing contract with the Tennessee Department of Correction to authorize construction of additional cells for felons sentenced locally to Davidson County;

c. Substantially completed the construction of a new misdemeanor jail containing at least 400 beds. The date of substantial completion of the new jail shall be the date that the Metropolitan Government's architect certifies that the construction is sufficiently complete that inmates may be incarcerated in the new jail.

9. On February 9, 1997, the Metropolitan Government open[ed] its new 600 bed misdemeanor facility, the Correctional Work Center (CWC), located directly across from its existing Metropolitan Davidson County Detention Facility [ (MDCDF) managed by Corrections Corporation of America] on the old DeBerry site off Harding Road in Antioch.

10. The Metropolitan Government's Criminal Justice Information System (CJIS) now integrates criminal court records with police arrest records and Sheriff records. One of the CJIS reports, the

emergency release report, ranks inmates in order that scarce jail space may be allocated in accordance with the criteria programmed in the event that the jails become overcrowded.

11. On August 27, 1999, the Metropolitan Government exceeded the population capacity limits for seven consecutive days, the only time it has done so in the eleven (11) years it has been under the Court's injunction. The inmate population was quickly brought back within limits and has remained within limits for the last two years.

12. On November 1, 1999, the Metropolitan Government hired Don Stoughton and Associates to act as criminal justice consultants and technical advisors to the Metropolitan Government's Criminal Justice Policy Group.

13. The Criminal Justice Policy Group is chaired by the Metropolitan Mayor and its other members include the Sheriff, Chief of Police, District Attorney, Public Defender, Presiding Judge of the General Sessions Court and the Presiding Judge of the Criminal Court. The Director of Law and the Criminal Justice Coordinator are staff support to the Criminal Justice Policy Group. This task force meets at least once a month to address criminal justice system issues. The mission of the Criminal Justice Policy Group is to carry out the *Metropolitan Government's Final Jail Management Plan.*

14. On December 1, 1999, pursuant to this Court's directive during the Status Conference held on October 14, 1999, Plaintiffs' counsel inspected the Metropolitan Government's Hill Building Complex Jail and the Criminal Justice Center and filed her *Report* with the Court.

15. On April 7, 2000, the Metropolitan Government filed the *Metropolitan Government's Final Jail Management Plan* with the Court.

16. On October 17, 2000, the Metropolitan Council authorized funding to provide an additional courtroom for a new criminal court. *The Tennessee Judicial Weighted Case Load Study of May 1999* had confirmed Davidson County's need for another criminal court. The Judicial Council for the State of Tennessee, pursuant to T.C.A. § 16–21–107, met on November 28, 2000, and recommended passage of an amendment to T.C.A. § 16–2–506(20) that would create the additional court. Although both judiciary committees of the Tennessee General Assembly approved the proposed legislation to create a new criminal court in Davidson County, ultimately the funds were not appropriated. The new criminal court is needed.

17. On November 14, 2000, the State of Tennessee agreed to fund over $2,500,000 for the Metropolitan Government to employ consulting services to prepare bid specifications, including physical design and programming specification, for the construction and operation of additional correctional capacity at the old DeBerry site in Antioch, Tennessee.

18. With passage of the Metropolitan Government's new fiscal year budget, the Metropolitan Government created and funded the new Office of Capital Projects within the Finance Department. This office coordinates all capital project expenditures. Through this new office Don Stoughton and Associates have been hired to conduct the needs assessment and pre-design planning for adding additional cell capacity at the old DeBerry site. Stoughton and Associates subcontracted The Institute of Crime, Justice and Correction of George Washington University, James Austin PhD, to provide inmate population projections for the needs assessment.

The defendant, The Metropolitan Government of Nashville and Davidson County (Metro), has now moved to dissolve the

injunction setting population caps on its jails and dismiss this case. At a hearing on this motion on August 29, 2001, the defendant offered the testimony of Mr. Don Stoughton, who was retained in November 1999 to act as a consultant and technical advisor to Metro's criminal justice policy steering committee. Originally retained by the Metro legal office to assist with compliance in this case, Mr. Stoughton currently serves as an advisor to the Metropolitan Government Finance Department's capital projects office. Mr. Stoughton has worked in the correctional management and consultation business for twenty years, and spent eight years as a correctional administrator. He also has experience as a special master in correctional litigation. Prior to becoming involved with Metro in this case, Mr. Stoughton had been in Tennessee since 1985, advising the State's oversight committee on corrections regarding compliance with the capacity caps ordered in state correctional facilities in *Grubbs v. Bradley*, No. 3:80–3404.

Mr. Stoughton testified that since 1999 he has continued working with both Metro and the State to devise a strategic coordinated plan to anticipate and meet their respective correctional capacity demands, including ending the litigation between Metro and the State and developing a plan to reduce the backlog of State inmates awaiting transfer from Metro facilities. He is currently studying the feasibility of adding housing capacity at the site referred to as the "old DeBerry" site in Antioch, Tennessee, near the six hundred bed site opened by Metro in 1997. At the time of the hearing, Mr. Stoughton anticipated that as early as November of last year he would have completed his projections and feasibility analysis and would be presenting his recommendations. While any capital building decisions Metro ultimately makes are beyond Mr. Stoughton's control, they will be made in light of well-reasoned information, and both Metro and the State have committed, in Mr. Stoughton's terms, "fair amounts" of money to addressing their correctional capacity needs.

■ As noted in the findings of fact above, the parties are in agreement that Metro has only exceeded the population caps imposed in this case for seven consecutive days on one occasion, in August 1999, in the past eleven years. However even if the jails were occasionally to exceed their rated capacities, that alone would not constitute an Eighth Amendment violation. *See Rhodes v. Chapman,* 452 U.S. 337, 347–48, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). Overcrowded conditions, even when restrictive and harsh, do not violate the Eighth Amendment unless they result in the deprivation of the minimal civilized necessities of life, such as food and reasonable measures of sanitation and safety. *See id.* at 348, 101 S.Ct. 2392; *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991); *Ivey v. Wilson,* 832 F.2d 950, 954 (6th Cir.1987). While the Magistrate Judge's findings in 1989 leave no room for doubt that the conditions then in place in Metro's facilities violated the Eighth Amendment, the Court must now consider whether those violations continue today.

■ During the hearing the Court asked Mr. Stoughton whether, based upon his years of experience and knowledge of the applicable standards for correctional conditions, he had an opinion as to whether the current conditions in Metro's facilities comply with the requirements of the Eighth Amendment. Mr. Stoughton, who has personally toured the facilities, testified that Metro's facilities are currently in compliance with constitutional requirements. Specifically, Mr. Stoughton testified that the facilities' environment, sanitation and fire safety comply with the Eighth Amendment, and that existing safety con-

ditions, including classification procedures, provide adequate levels of personal security for inmates and staff. He further testified that the food service appears to him to be adequate and acceptable, although he is not a dietician, and that there is adequate physical space available for recreation. Mr. Stoughton testified that two of Metro's four correctional facilities have achieved accreditation by the American Correctional Association, and that the other two have applied for and will probably receive accreditation within the next year.

The Court finds Mr. Stoughton's testimony, which was unchallenged at the hearing, to be credible and persuasive evidence that the constitutional violations that originally warranted the imposition of population caps in this case no longer exist within Metro's correctional system. The Prisoner Litigation Reform Act of 1996 provides for the termination of prospective injunctive relief in pertinent part as follows:

(b) Termination of relief.-

(1) Termination of prospective relief.(A) In any civil action with respect to prison conditions in which prospective relief is ordered, such relief shall be terminable upon the motion of any party or intervener -

(i) 2 years after the date the court granted or approved the prospective relief;

(ii) 1 year after the date the court has entered an order denying termination of prospective relief under this paragraph; or

(iii) in the case of an order issued on or before the date of enactment of the Prison Litigation Reform Act, 2 years after such date of enactment.

\*     \*     \*     \*     \*     \*

(2) Immediate termination of prospective relief.—In any civil action with respect to prison conditions, a defendant or intervener shall be entitled to the immediate termination of any prospective relief if the relief was approved or granted in the absence of a finding by the court that the relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right.

(3) Limitation.—Prospective relief shall not terminate if the court makes written findings based on the record that prospective relief remains necessary to correct a current and ongoing violation of the Federal right, extends no further than necessary to correct the violation of the Federal right, and that the prospective relief is narrowly drawn and the least intrusive means to correct the violation.

18 U.S.C. § 3626(b). Accordingly, because there are no facts before the Court from which it could find a current, ongoing constitutional violation within the Metropolitan Government's jail facilities related to overcrowding, Metro is entitled to immediate termination of the injunction imposing population caps.

Indeed, even without the strict requirements of the PLRA, it would be error for the Court to conclude otherwise. Where the goals of the imposed relief have been achieved, and there is no evidence of a likelihood that the original violations will be promptly repeated upon lifting the injunction, "[j]udicial oversight over [local] institutions must ... draw to a close." *Johnson v. Heffron*, 88 F.3d 404, 406–07 (6th Cir.1996) (citing *Bd. of Educ. of Oklahoma City Public Schools v. Dowell*, 498 U.S. 237, 248–49, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991)). This Court's continued control over inmate populations in Metro's jail system would be an unwarranted intrusion into the affairs of local government, and interference with decisions best left to the expertise of the system's clearly capable administrators.

The Court notes that Metro's motion to dissolve the injunction addresses only the imposition of population caps on its facilities, and does not make reference to the parties' previous agreement, adopted by the Court, that no inmates are to be housed at the Workhouse absent appropriate renovation and Court approval, except in cases of civil emergency. (See Remedial Plan, filed April 30, 1991, Docket Entry No. 248, p. 1; Order adopting remedial plan, entered May 1, 1991, Docket Entry No. 247; Special Master's Fourth Progress Report, filed November 17, 1993, Docket Entry No. 336, pp. 2, 13). Based on the facts in the record regarding the condition of the Workhouse at the time that agreement was reached, and the lack of any evidence of the significant structural improvements that would have been necessary to transform the Workhouse into a facility capable of safely housing inmates in keeping with the Eighth Amendment, the Court concludes that the prohibition on housing inmates at the Workhouse remains necessary to prevent an otherwise certain violation of the Eighth Amendment. Dissolution of that prohibition has not been requested and is not effectuated by this ruling.

In conclusion, the Court wishes to express its gratitude to the plaintiffs' counsel, Ms. Susan Kay, for the enormous service she has performed for the class of plaintiffs and the community in this case. Likewise, the defendants and their counsel are to be commended for their professionalism and forthrightness in conceding the unconstitutional conditions then present in their correctional system, and for working diligently in the years that followed to improve the conditions in which the Metropolitan Government's inmates are housed. Former Sheriff Hillin and the current Sheriff, Ms. Gayle Ray, are commended for their efforts in cleaning up the despicable conditions of the local penal system. Finally, the Special Master, Mr. Allen Breed, deserves the compliments of the Court for his wise guidance in overseeing the rehabilitation of the Metropolitan Government's jail system.

An appropriate order will be entered.

### ORDER

This matter is before the Court on the motion (filed December 20, 2000; Docket Entry No. 386) by the defendant, The Metropolitan Government of Nashville and Davidson County, to dissolve the injunction setting jail population caps and dismiss this action, to which the plaintiffs have responded. (Response filed January 22, 2001; Docket Entry No. 394).

In accordance with the contemporaneously entered memorandum, the defendant's motion to dissolve the injunction on jail population caps and dismiss is granted, and this case is dismissed. However, the injunction previously entered precluding the housing of inmates at the Workhouse absent renovation sufficient to comply with the Eighth Amendment and Court approval (except in cases of civil emergency, as properly declared by the Mayor, for a period not to exceed fifteen days without Court approval), shall remain in full force and effect.

The entry of this order, and the previous order (entered April 7, 1993; Docket Entry No. 310) dismissing the third party claim, shall constitute the judgment in this action, including each of the consolidated cases.[1] (See Order entered June 22, 1993; Docket Entry No. 322).

It is so ORDERED.

---

**1.** The Court previously instructed the Clerk to    close these cases administratively, noting that

they would be incorporated into any final judgment entered in this case: *David Steelman v. Steven Norris,* 3:87–0577; *Henry Washington Bennett v. Davidson County Jails,* 3:87–0581; *David Steelman v. Fate Thomas,* 3:88–0832; *James Lyons v. Fate Thomas,* 3:88–0035; *Jerry Erving Buckner v. Fate Thomas,* 3:88–0078; *David Kohler v. Fate Thomas,* 3:88–0253; *John Snider v. Fate Thomas,* 3:88–0370; *Fred Huffman v. Fate Thomas,* 3:88–0943; *Burney Davidson v. Davidson County Sheriff Dept.,* 3:89–0546; *John Joseph Gobbi v. Davidson County Sheriff's Dept.,* 3:90–0051; *Wayne H. Barrett v. Davidson County Sheriff's Dept.,* No. 3:90–0852; *Charles Shoemake v. Davidson County Sheriff's Dept.,* 3:91–0185.